Argued and submitted March 3, decision of the Court of Appeals and judgment of the circuit court affirmed May 20, 2004

# STATE OF OREGON,
*Respondent on Review,*

*v.*

# DANIEL PAUL MIGLAVS,
*Petitioner on Review.*

CC C000009CR, C000111CR;
CA A111137 (Control), A111138; SC S50279)

90 P3d 607

Garrett A. Richardson, Portland, argued the cause and filed the brief for petitioner on review.

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for respondent on review. Julie A. Smith, Assistant Attorney General, filed the brief. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

DE MUNIZ, J.

---

** Kistler, J., did not participate in the consideration or decision of this case.

## DE MUNIZ, J.

The issue in this criminal case is whether a police officer lawfully engaged in a precautionary patdown[1] of defendant in accordance with the officer safety rule set out in *State v. Bates*, 304 Or 519, 747 P2d 991 (1987). Because there were multiple charges against defendant arising out of separate police patdowns and a subsequent search of defendant's residence, we first set out the procedural history in some detail.

Defendant was charged with two counts of unlawful possession of a firearm based on evidence uncovered during a patdown (the patdown at issue here) conducted in August 1999. Defendant moved to suppress the evidence that the police discovered during that patdown. Following an evidentiary hearing, the trial court denied defendant's motion to suppress that evidence.

The same indictment also charged defendant with two other counts of unlawful possession of a firearm as a result of evidence uncovered in a patdown that the police conducted in September 1999. Defendant moved to suppress the evidence obtained as a result of that patdown, and the trial court granted that motion.

Finally, the police executed a search warrant at defendant's residence in December 1999 and seized evidence that led to defendant being charged separately with seven other weapon and drug-related crimes. Defendant moved to suppress that evidence as well, and the trial court denied that motion.

The court consolidated all charges and tried them at the same time. Defendant ultimately was convicted of two counts of unlawful possession of a firearm seized as a result of the August patdown and three counts of unlawful possession of a firearm seized during the December search of defendant's residence.

---

[1] Our use of the term "patdown" is intended to mean "an external patting of a person's outer clothing," as described in ORS 131.605(3).

Defendant appealed, contending that the police had relied on the evidence that they discovered during the August patdown to obtain the search warrant that led to the discovery of the evidence seized during the December search of defendant's residence. A divided en banc Court of Appeals affirmed the trial court's rulings denying defendant's motions to suppress evidence discovered during the August patdown and the December search of his residence. *State v. Miglavs*, 186 Or App 420, 63 P3d 1202 (2003). We allowed defendant's petition for review. For the reasons that follow, we conclude that the August patdown was lawful and, therefore, affirm the trial court judgment and the decision of the Court of Appeals.

We take the following facts from the Court of Appeals majority opinion:

"Just after midnight in August 1999, Officer Brown, who was on patrol alone, saw defendant and another man standing outside a car, talking to a woman seated in the car, in the parking lot of an apartment complex in Beaverton. They were below an apartment overhang, which caused the area to be fairly dark. Because Brown suspected that all three individuals were under 18 years of age and possibly violating curfew, she approached the group. On approaching, she saw alcohol in the car. She asked for identification so that she could determine if any alcohol-related or curfew violations may have occurred. Defendant and the woman in the car gave Brown their identification, which she kept while she ran a records check on them. The other male said that he was 17 years old and gave his name and date of birth in lieu of other identification. The dispatcher reported that defendant was a possible runaway, but defendant told the officer that he had recently turned 18. He also told the officer that he lived in the apartment complex, even though his identification listed a different address. He was unwilling to tell the officer in which apartment he resided.

"Because she was on patrol alone, Brown called for backup while she was checking the ages and identities of the three individuals. Two backup officers arrived within a couple of minutes. By the time they arrived, Brown had determined that the driver of the car was 21 years old and therefore lawfully in possession of alcohol. She also had determined that defendant was 18 years old and therefore

not violating curfew. Brown returned defendant's and the driver's identification to them, making no overture to cite or hold them. They were then free to go, but Brown did not expressly tell them that. They remained while Brown continued her investigation of the 17-year-old for a possible curfew violation.

"At that point, Brown was concerned for her personal safety and that of the backup officers. Defendant and his male companion were wearing distinctive clothing commonly associated with a gang called the '18th Street' gang. Typical of that gang, defendant had a shaved head and was wearing baggy tan pants and a baggy black shirt with the term '18th Street' printed on the back in large white letters. Defendant's companion also was wearing baggy gang-style clothes and had a three-dot tattoo under his eye that is associated with gang membership. The baggy style of the clothing concerned Brown because, in addition to signaling gang affiliation, the clothing permitted easy concealment of a weapon. Within the preceding year, Brown had come into contact with a similarly attired gang member in the parking lot of the same apartment complex who, on a patdown search, was found to have a weapon concealed in his waistband under his baggy clothing. Also, based on her training and experience more generally, Brown knew that members of the 18th Street gang commonly carry weapons—in particular, guns.

"One of the backup officers, Officer Cockreham, shared Brown's safety concerns. His concerns arose because of defendant's 18th Street gang-affiliated clothing, as well as the way in which defendant's shirt was draped over his waist. Cockreham had personally removed weapons from several 18th Street gang members in the same general area (*i.e.*, along Allen Boulevard between Hall and King); one such encounter occurred 'just previously to this incident' and the weapon he found on the gang member was a gun. Brown directed Cockreham to patdown defendant for weapons. On doing so, Cockreham found a gun concealed in the waistband of defendant's pants."

186 Or App at 422-24 (footnote omitted).

In affirming the trial court's rulings denying defendant's motion to suppress the gun, the Court of Appeals majority relied on this court's earlier decision in *Bates*. There, this court held that

"Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*Id.* at 524. The Court of Appeals majority began its analysis by characterizing the basis for the officers' particularized suspicion of defendant:

"The officers' safety concerns here were not stereotypical in the sense that they derived only from a generalized and oversimplified view of how all members of a broad group behave in all circumstances. Rather, Brown and Cockreham had *particular* training in and experience with members of a *particular* gang—the 18th Street gang—and its local activities. The officers, based on training and experience relating to that *particular* gang, knew that its local members commonly carried concealed weapons. They knew, moreover, that guns were often the weapon of choice for members of the 18th Street gang."

*Miglavs*, 186 Or App at 427 (emphasis in original). The court concluded that several factors contributed to the officers' reasonable fear for their safety:

"On whole, then, we have this: defendant was a likely member of not just an urban gang but of a particular gang known to operate in the area—the 18th Street gang—whose local members commonly carry guns; he was wearing clothes that could have concealed a gun; the officers had both longer-term and very recent experience with members of the 18th Street gang in the area who were armed with concealed weapons; it was late; it was dark; and defendant chose to protract the encounter with the officers. The totality of what the officers knew and the circumstances with which they were confronted went beyond a generalized understanding of the practices of urban gangs and encompassed a specific and particularized reality as to defendant and the 18th Street gang, of which defendant was a likely member."

*Id.* at 428. The court thus affirmed defendant's convictions.

Judge Haselton agreed with the majority, but wrote separately to clarify that the court's decision did "not authorize 'officer safety' searches based solely on a citizen's 'suspicious' appearance or possible association with a potentially dangerous group." *Id.* at 435 (Haselton, J., concurring). He further explained that "our holding does not write a blank check for 'officer safety' patdowns resulting from officer-initiated contacts with young men or women wearing 'gang style' clothing." *Id.* (Haselton, J., concurring).

Judge Edmonds and Judge Armstrong dissented in separate opinions. Judge Edmonds asserted that the constitutional right to associate requires that the constitutional protections against unreasonable searches and seizures apply equally to "those who belong to gangs, wear baggy gang-related clothing, or identify with groups known to be violent" as they do to others. *Id.* (Edmonds, J., dissenting). He opined that defendant's decision to remain at the scene after Brown concluded her investigation of him was the only fact that could have contributed to her concern that defendant might pose an immediate threat to her safety or that of others. *Id.* at 436 (Edmonds, J., dissenting). But that fact, Judge Edmonds asserted, was of little significance in light of defendant's cooperative attitude and the fact that Brown did not tell him that he was free to leave. *Id.* (Edmonds, J., dissenting). Judge Edmonds further posited that Brown's failure to direct defendant to leave indicated that she did not perceive defendant to be a greater threat at the end of the investigation than she had at the beginning. *Id.* (Edmonds, J., dissenting). According to Judge Edmonds, the majority's decision would permit the police to patdown "any person dressed in gang attire and present in a mall or other public place * * * even in the absence of individualized suspicion[,]" contrary to Article I, section 9, of the Oregon Constitution.[2] *Id.* at 436-37 (Edmonds, J., dissenting).

_____

[2] Judge Edmonds's concern notwithstanding, this case is not about whether Article I, section 9, would allow the police to patdown a known gang member in a public place for the sole reason of performing a patdown for weapons. Among other differences, the patdown in this case occurred in the context of a lawful police investigation and took place at night in the general area where one of the officers had recently encountered an armed member of the same gang.

Judge Armstrong similarly believed that the officers' knowledge that defendant was a member of the 18th Street gang, and their prior experiences with that gang, were not "sufficient to give the officers a reasonable basis to believe that defendant was a member of the 18th Street gang who, because of that membership, was reasonably likely to be carrying a gun." *Id.* at 439 (Armstrong, J., dissenting). He also could not discern a difference between the officers' knowledge that defendant was a member of a particular gang that was known to carry guns and their knowledge that members of a particular type of gang carry guns. *Id.* at 440 (Armstrong, J., dissenting). "In either case" Judge Armstrong observed, "the state seeks to rely on a syllogism that people of a particular group often carry weapons, that the defendant appears to be a member of that group, and that it is therefore reasonable to suspect that the defendant is carrying a weapon." *Id.* (Armstrong, J., dissenting). He noted further, as did Judge Edmonds, that Brown did not have a reason to fear for her safety because defendant was cooperative and because Brown had not waited for the backup officers to arrive to conduct her investigation of the three individuals. *Id.* at 440-41 (Armstrong, J., dissenting). In Judge Armstrong's view, defendant's failure to leave when Brown returned defendant's identification was of no significance because Brown should have understood that defendant merely wished to resume his encounter with his friends. *Id.* at 441-42 (Armstrong, J., dissenting).

■ In this court, defendant relies on the dissenting opinions by Judge Edmonds and Judge Armstrong and argues that the Court of Appeals majority erred in its application of the *Bates* rule because Brown did not have a particularized suspicion that defendant was armed *and* might pose a threat to the officers' safety. He observes that, when Brown had concluded her investigation of defendant, she did not tell him that he was free to leave, from which he argues that his failure to leave should not have contributed to Brown's safety concerns. He notes further that he was "cooperative and unthreatening" and, thus, should not have made the officers feel that he presented an immediate risk to their safety.

The state responds that this court needs to decide only whether "the officers' belief that defendant might be

armed and dangerous [was] a reasonable one." In its view, "the officers reasonably believed that this defendant might pose an immediate threat primarily because he had expressly affiliated himself with a particular gang, the local members of which operate in the immediate vicinity and, in the officers' training and experience, often are armed." Further, the state argues, "[t]hat suspicion was sufficiently particularized because it was based on characteristics shared by a narrow and well-defined category of persons with whom the officers had specific experiences and about whom the officers had received training." For the reasons that follow, we agree with the state.

We begin with a review of *Bates*. In that case, a City of Eugene police officer stopped the defendant for " 'excessive vehicle emissions' " at 4:40 a.m. *Id.* at 521. The stop occurred in a " 'high crime' " area and the officer called for assistance. *Id.* Two officers approached the defendant's vehicle and one officer asked for the defendant's driver license. *Id.* The officers noticed that there was a "television and a videocassette recorder [VCR]" on the back seat of the defendant's vehicle. *Id.* One officer also noticed "an object on the floorboard between [the] defendant's feet." *Id.* The other officer also took note of the object and " 'asked [the defendant] if he would reach down and very cautiously pull that item from between his feet," so that the officer could see what it was. *Id.* The defendant refused and instead "reached under the seat and remained in that position" while the officer repeatedly asked him to pull the item into plain view. *Id.* The officer then pulled his gun and ordered the defendant to step out of the car. *Id.* The officer then obtained the bag from under the seat, felt something hard inside, opened it, and discovered "several rounds of live ammunition, drugs, and drug paraphernalia." *Id.* at 522.

The court began its analysis by noting the state's reliance on the Supreme Court's analysis of officer safety searches in *Michigan v. Long*, 463 US 1032, 103 S Ct 3469, 77 L Ed 2d 1201 (1983), and this court's own previous analysis in *State v. Riley*, 240 Or 521, 402 P2d 741 (1965), in which the court had acknowledged that "police officers are entitled to take steps reasonably necessary to their safety." *Bates*, 304 Or at 523. The court then held, as set out above, that Article

I, section 9, of the Oregon Constitution "does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion" that the suspect "might pose" a danger to the officer or others. *Id.* at 524. The court explained that

> "it is not [this court's] function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. *Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made.*"

*Id.* at 524-25 (emphasis added). *See also State v. Amaya*, 336 Or 616, 89 P3d 1163 (2004) (same).

The *Bates* court concluded, however, that the officers had exceeded the permissible bounds of the rule. *Id.* at 525-26. It reached that result by assessing the significance of each factor that the officer identified as contributing to his conclusion that the defendant posed an immediate threat. *Id.* The officer testified that the vehicle's out-of-state license plates, the time of day, the high crime area, the defendant's appearance, the fact that there was a television and a VCR on the back seat of the defendant's vehicle, and the fact that the defendant did not comply with the officer's instruction to pull into plain view the item that he could not see fully, all contributed to his concern about the defendant's possible dangerousness. *Id.* at 525.

This court, however, concluded that none of the identified factors, even when considered collectively, supported a reasonable suspicion that the defendant posed an immediate threat to the officers' safety. The court observed that the suspicions of the officer who ordered the defendant out of the car

> "may have been an excellent guess—the kind resulting from a sixth sense that many officers develop over the years. But, again, there is no objective quality to them that

entitles them to any weight, either individually or collectively, in the constitutional calculus. Neither the hour nor the 'high crime' nature of the area tells us whether *this* defendant is likely to be a criminal, unless there is some reason to think that everyone driving in that particular area at that time of night is up to no good[.]"

*Id.* at 526 (emphasis in original). As in *Bates*, our inquiry in this case is limited to whether the precautionary patdown was reasonable under the circumstances as they reasonably appeared at that time.

Here, the officers testified that the following factors contributed to their determination that defendant might pose an immediate threat to their safety: (1) defendant "was wearing bagg[y] tan pants and a black bagg[y] shirt that had '18th' written on the back of the shirt in large white letters[,]"[3] which the officers associated with the attire of 18th Street gang members; (2) the young man with defendant also had a gang-related tattoo consisting of three dots in the shape of a triangle that Officer Brown knew meant " '[m]i vida loca' " or " 'my crazy life' in English" and his shirt also had the number 18 on it; (3) both defendant and the man with him were wearing, "untucked[,]" "extremely bagg[y clothing that] could easily conceal weapons"; (4) the officers knew that 18th Street gang members operated in the vicinity of the encounter and that they carried guns; (5) Officer Cockreham personally had removed weapons from several 18th Street gang members and had removed, just previously to this incident, a gun from an 18th Street gang member; and (6) neither defendant nor the woman in the car chose to leave after Brown returned their identification.

Before evaluating the factors described above, we first address defendant's argument that his cooperative attitude and lack of suspicious behavior was sufficient to dispel any concerns that the officers had for their safety. Defendant is correct that those circumstances must be considered in the overall assessment of the reasonableness of the officers' decision to engage in the patdown. However, defendant's attitude and demeanor are just two circumstances that the officers

---

[3] Officer Cockreham testified that defendant's shirt "actually said '18th Street' on it[.]"

and, ultimately, this court must consider in determining whether the totality of the circumstances justified the decision to engage in a precautionary patdown. *See State v. Ehly*, 317 Or 66, 83, 854 P2d 421 (1993) ("totality of the circumstances" are considered in determining whether officer's suspicion was reasonable). As we now explain, those countervailing circumstances, considered in light of the totality of the circumstances, are not sufficient to dispel the reasonableness of the officers' particularized suspicion that defendant might have posed a danger to their safety.

■      Under *Bates*, a limited precautionary patdown is authorized under Article I, section 9, only when the initial contact between the police and the individual is lawful. Here, defendant concedes that Brown was engaged in a lawful contact with defendant. Brown had approached the vehicle to investigate possible curfew, and later, alcohol violations. She requested defendant's identification and, upon concluding her investigation, promptly returned defendant's identification to him. In other words, as noted previously, the police contact was not initiated solely (or at all) because defendant and his companion were wearing gang attire.

■      Next, *Bates* requires an evaluation whether the factors that the officers claim supported their belief that defendant might pose an immediate threat to their safety are sufficiently particularized to defendant as required under Article I, section 9. This court repeatedly has explained that a person's appearance alone never can support a reasonable suspicion of unlawful activity. *See State v. Valdez*, 277 Or 621, 628, 561 P2d 1006 (1977) (explaining that "shined shoes, sharp clothes, neat 'Afro' haircuts and people who stand and stare at officers" cannot say much about those people engaging in criminal activity); *Bates*, 304 Or at 525 (explaining that fact that defendant was "an 'Indian' with long hair and beard" wearing black leather jacket could not support reasonable suspicion to believe that he was dangerous). A police officer's suspicion must be particularized to the individual based on the individual's own conduct. *State v. Stanley*, 325 Or 239, 245-46, 935 P2d 1202 (1997); *Bates*, 304 Or at 525; *Valdez*, 277 Or at 628. Regardless of the officers' belief that gang members wear baggy clothing, that type of clothing alone could not support a reasonable suspicion that defendant

posed a risk to the officers' safety. That is, nothing about such attire alone could tell the officers anything about defendant, except that he liked to wear baggy clothing. Nevertheless, a particular style of attire may be a circumstance that, when considered in the overall context or totality of the circumstances of a police-citizen contact, contributes to the reasonableness of an officer's safety assessment.

■ Similarly, clothing that announces a gang affiliation does not, by itself, give rise to the kind of individualized suspicion of a safety threat required under Article I, section 9. However, officers reasonably may draw inferences about human behavior from their training and experience. *See Stanley*, 325 Or at 246-46 (in officer's experience, people who commit robberies often are armed); *Ehly*, 317 Or at 80-81 (in officer's experience, drug users often are armed). In this instance, the officers knew from training and recent personal experience that the gang identified on defendant's shirt operated in the immediate vicinity of the contact and that members of that gang carried weapons. Furthermore, one of the officers recently had removed a gun from one of the members of that gang. Under those circumstances, the officers' safety concerns regarding defendant were not based solely on generalized or stereotypical information about gang behavior but, instead, were sufficiently particularized, based on specific training about and recent personal experience with a narrowly identified group, *viz.*, members of the local gang to which defendant and his male companion proclaimed their allegiance and which operated in the area where the officers encountered defendant.

Finally, in addition to defendant's self-proclaimed gang membership and the officers' training and recent experience with other gang members, there are other factors that contribute to the reasonableness of the officers' safety concerns. First, the contact with defendant and his two companions occurred at a late hour in a darkened area in the general vicinity where one of the officers recently had encountered armed members of the 18th Street gang. Defendant was uncooperative during the initial investigation when he refused to reveal the location of his residence in the apartment complex. *See Amaya*, 336 Or at 633 (refusal to leave

purse-like bag in vehicle when requested to do so was one factor that heightened officer's safety concern).

Second, although defendant was free to move from the immediate area after his identification was returned to him, he chose to remain in the area near where the police were conducting an ongoing investigation. When defendant remained in that close proximity to the officers, the officers' safety concerns reasonably were heightened because the officers needed to focus their attention on defendant's companion and were not able to watch defendant as closely as they could before that time. As this court explained in *Bates*:

> "A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed *considerable latitude* to take safety precautions in such situations."

*Bates*, 304 Or at 524 (emphasis added).

Here, the combination of factors that the officers identified were sufficient to give rise to a reasonable and individualized suspicion that defendant *might* have posed a safety threat to them. That individualized suspicion justified the limited precautionary patdown of defendant that occurred in this case and did not violate defendant's protection against unreasonable search and seizure under Article I, section 9, of the Oregon Constitution.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.