Argued and submitted February 18, reversed and remanded May 27, 2009

In the Matter of M. A.-J.,
a Youth.

STATE ex rel JUVENILE DEPARTMENT
OF WASHINGTON COUNTY,
*Respondent,*

*v.*

M. A.-J.,
*Appellant.*

Washington County Circuit Court
J060052; A132701

209 P3d 381

Daniel A. Cross argued the cause and filed the brief for appellant.

Leigh A. Salmon, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

In this juvenile delinquency case, youth was found to be within the jurisdiction of the juvenile court for having committed an act that, if committed by an adult, would have constituted the offense of unlawful possession of a firearm. ORS 419C.005(1). On appeal, he contends that the court erred in denying his motion to suppress evidence of a firearm that a police officer found in youth's possession as a result of a patdown during what youth argues was a stop. Youth argues that both the stop and the patdown were unlawful. We conclude that, even assuming that the stop was lawful, the patdown was not and that the court erred in denying the motion to suppress. We therefore reverse and remand.

The relevant facts are few and undisputed. Sergeant Goerling was called to the Willow Creek MAX station in Hillsboro on a complaint unrelated to this case at approximately 8:30 a.m. There was a moderate amount of pedestrian traffic at the station at that time. When Goerling arrived at the station, he saw three young Hispanic males—including youth—sitting on bicycles on one side of the MAX station platform. The three were sitting side-by-side and appeared to Goerling to be impeding traffic on that side of the platform. Goerling saw that all three of them were wearing "baggy" clothing and that one—not youth—wore a "colorful blue and white checkered shirt."

Goerling was concerned that the three youths might be intimidating passengers, although he witnessed no confrontations or other interactions between the youths and anyone else in the area. It was, he later acknowledged, a "peaceful morning on [the] MAX platform." He got out of his patrol car and approached the three youths. He asked them what they were doing and informed them that it was a violation of local transit authority ordinances to ride bicycles on the train station platform. As he approached, he recognized one of the three youths, Mesa, who was wearing the blue and white checkered shirt. About a week and a half earlier, Goerling had encountered Mesa in a residence where he had responded to a domestic disturbance call. Also at the residence at the time was a man in his mid-30s who had informed Goerling that he was a member of a gang in Los Angeles and

that he had recently moved to Hillsboro. The man had been wearing the same sort of clothing that Mesa now was wearing.

Goerling became concerned for his safety. He reasoned that at least one of the three youths might have had an association with a gang member, all were wearing baggy clothing, and one of them was wearing clothing similar to what he had observed a known gang member wearing on one occasion. Goerling had 14 years of law enforcement training and experience, and he knew that individuals involved in the "Latino gang culture" wear baggy clothes, and that wearing such baggy clothing is "a very convenient way to conceal any number of things, weapons or other things, drugs, you know, what have you, that you want to conceal." Moreover, he noted, the particular color and pattern of Mesa's shirt were "common" to gang attire. He decided to pat them down for weapons. As a result of the patdown, Goerling found in youth's possession a loaded pistol.

Youth moved to suppress the evidence of the weapon on the ground that the patdown was unlawful. The juvenile court denied the motion. The court explained that

"it was reasonable under the circumstances for the officer to suspect gang affiliation based on the clothing and the fact that we have three young persons who all appear to fit within that description and that upon closer encounter that at least one of those persons was a person who the officer had seen with an adult member of a gang that is known to exist in another area."

The court explained that one of the known behaviors of gang members is the possession of weapons and that the concern for weapons possession justified the patdown.

On appeal, youth advances two arguments in support of his contention that the court erred in denying his motion to suppress. First, he contends that Goerling's questioning of the three youths amounted to an unlawful stop. Second, he contends that, in any event, there was no basis for Goerling's patdown, certainly none of the specific and articulable concerns about immediate threats to public or officer safety, which he contends the law requires to justify such police conduct.

The state responds that youth did not preserve his first contention, concerning the lawfulness of the stop. In any event, the state contends, the stop was lawful because Goerling reasonably believed that the youths had violated a local ordinance that prohibited disturbing the peace by "[p]articipating or abetting in any rude, indecent, riotous, or violent conduct" and a transit district ordinance prohibiting riding bicycles on station platforms. As for the patdown, the state contends that, under the Supreme Court's decision in *State v. Miglavs*, 337 Or 1, 90 P3d 607 (2004), Goerling "had reasonable suspicion that youth was armed and might pose an immediate threat" because he and his companions wore baggy clothes and could have been members of a Latino gang.

■     We need not address the parties' contentions concerning the lawfulness of the stop because, even assuming that the stop was lawful, the patdown was not.

In *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987), the Oregon Supreme Court set out the basic test for determining the lawfulness of a precautionary patdown by a law enforcement officer:

> "[W]e hold that Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

The court also cautioned that

> "it is not our function to uncharitably second-guess an officer's judgment. A police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures. An officer must be allowed considerable latitude to take safety precautions in such situations. Our inquiry therefore is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made."

*Id.* at 524-25.

In *Miglavs*, the court applied those principles in upholding a police officer's "precautionary patdown" of a defendant suspected of being a member of a gang. 337 Or at 3, 14. In that case, Brown, a single officer on patrol alone just after midnight, encountered the defendant and another man talking to a woman seated in a car. The defendant was standing in a darkened area underneath an apartment building overhang. Brown asked the three individuals for identification. The defendant initially was uncooperative, refusing to tell the officer where he lived, though he did produce identification. Brown called for backup. *Id.* at 4. In the meantime, she verified the defendant's identification and he was free to go. *Id.* at 4-5. He remained at the scene, however, as Brown continued an investigation concerning his companion. *Id.* at 5.

Brown noticed that the defendant and his companion wore "distinctive" clothing associated with the "18th Street" gang, located in the immediate vicinity. She saw the words "18th Street" printed on the back of his shirt. She knew, based on her training and experience, that members of the 18th Street gang commonly carried guns. One of the backup officers also shared Brown's safety concerns. That officer had personally removed weapons from several 18th Street gang members in that area "just previously to this incident." The officers patted down the defendant and found a gun concealed in the waistband of his pants. *Id.* at 5.

■ In assessing the lawfulness of the officers' patdown, the Supreme Court reviewed the *Bates* considerations that we just quoted and concluded that the facts, taken together, were sufficient to establish the requisite particularized concerns for immediate threats to the safety of the officers. *Miglavs*, 337 Or at 9-10, 14. Turning to the application of the *Bates* considerations, the court began by commenting on the fact that the defendant and his companion wore baggy clothing associated with gang membership. "[A] person's appearance alone," the court declared,

"*never* can support a reasonable suspicion of unlawful activity. * * * Regardless of the officers' belief that gang members wear baggy clothing, that type of clothing alone could not support a reasonable suspicion that defendant posed a

> risk to the officers' safety. That is, nothing about such attire alone could tell the officers anything about defendant, except that he liked to wear baggy clothing."

*Miglavs,* 337 Or at 12-13 (citations omitted; emphasis added). Even clothing that announces a gang affiliation does not, by itself, justify a precautionary patdown for officer safety reasons. *Id.* at 13. An individual's appearance, the court explained, is merely a factor that may be taken into account in considering the "overall context or totality of the circumstances of a police-citizen contact." *Id.*

Under the circumstances of that case, the court said, the fact that the defendant's appearance connected him with a local gang, several members of which had just been found with weapons in that same area, gave his appearance added significance. *Id.* In addition, the court said, the encounter occurred late at night in a darkened area where armed gang members had just been apprehended. *Id.* Also important was the fact that the defendant was uncooperative during the initial investigation when he refused to reveal to Brown his residence. *Id.* at 13-14. Finally, the court noted, although the defendant was free to leave the area, he chose to remain near where the police were conducting a continuing investigation, which understandably heightened the officers' concerns about the defendant's intentions. *Id.* at 14. The court concluded that, under the totality of those circumstances, the patdown was lawful. *Id.*

This case bears only superficial resemblance to *Miglavs.* The only fact that the two cases share in common is that they involve persons who wore baggy clothing. In this case, there are none of the other factors that the court in *Miglavs* found supported the officers' safety concerns.

Specifically, in this case, Goerling encountered youth not late at night in a darkened and dangerous location, as was the case in *Miglavs;* instead, he encountered youth and his friends in broad daylight in a public transit station. In this case, youth did not wear clothing that identified him with a particular local gang, as was the case in *Miglavs;* rather, youth merely wore clothes that Goerling described as "baggy." In this case, youth himself was not connected in any way with membership in a local gang, as was the case in

*Miglavs*; instead, it was another of the three youths, Mesa, who was suspected of "possible" affiliation with a gang and, even then, solely on the basis of the color and pattern of his shirt and the fact that he had been seen in the same house as another individual who admitted to being a member of a gang in a different state. And in this case, unlike *Miglavs*, there is no evidence that youth was uncooperative with the investigating officer.

Reduced to its essence, the state's argument is that it was permissible for Goerling to search youth because youth (1) wore baggy clothing and (2) was with another person who wore baggy clothing of a color and pattern "common" to gangs and who had been seen in the same house as someone else who acknowledged being a member of a Los Angeles gang. That an individual wears baggy clothes and is seen in the company of someone who appears to know someone else who is in a gang is simply not enough to satisfy the requirement that there be "specific and articulable facts" that the individual poses "an immediate threat of serious physical injury" to the officers or others. *Bates*, 304 Or at 524. We conclude that the record is insufficient to justify the officer's patdown in this case and that, as a result, the juvenile court erred in denying youth's motion to suppress the evidence that resulted from that unlawful patdown.

Reversed and remanded.