Argued and submitted July 31, 2013, reversed and remanded May 21, petition for review allowed October 2, 2014 (356 Or 397)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JOSEPH LUCIO JIMENEZ,
aka Joseph L. Jimenez,
*Defendant-Appellant.*

Multnomah County Circuit Court
110241478; A148796

326 P3d 1222

Anne Fujita Munsey, Senior Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Pamela J. Walsh, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Schuman, Senior Judge.

SCHUMAN, S. J.

## SCHUMAN, S. J.

Defendant was convicted of unlawful possession of a firearm, ORS 166.250(1)(a).[1] On appeal, he assigns error to the trial court's denial of his motion to suppress evidence derived during what defendant characterizes as an unlawful extension of a traffic stop. The trial court ruled that there was no unlawful extension and that, in any event, even if there were, the search was justified under the officer-safety exception to the warrant requirement. We agree with defendant that the officer who obtained the disputed evidence did so during an unlawful extension of a stop and that the officer-safety exception does not apply. We therefore reverse and remand.

The relevant facts are not in dispute and are confirmed by a video, admitted as an exhibit, taken from the arresting officer's in-car camera. Around noon on January 24, 2011, Trooper Borchers of the Oregon State Police saw defendant walk across the street at a busy intersection in Portland (122nd Ave and Division) while the stop light there read "Don't Walk"—a Class D violation under ORS 814.020(1) and (3). Borchers noted that defendant was wearing a "puffy" black jacket over a "hoodie," oversized pants, and white tennis shoes—garb that Borchers thought might indicate gang affiliation. Borchers knew that the 122nd and Division intersection was in a high-crime area where gang activity was common. He turned his car around and drove to a position near defendant, who was sitting on a bench at a bus stop. When defendant saw Borchers's car approach, he began to walk away, until Borchers honked his horn and indicated to defendant that he should stop. Borchers then asked defendant why he had crossed the street against the light; defendant replied that he had seen somebody else doing the same thing and "thought it was okay as well." Borchers told defendant that the light had indicated "Don't Walk." "At that time point," he later testified, "for officer-safety reasons, I just asked [defendant] if he had any weapons on him,

---

[1] ORS 166.250(1) provides, in part:

"[A] person commits the crime of unlawful possession of a firearm if the person knowingly:

"(a) Carries any firearm concealed upon the person[.]"

which I do with all contacts on the street with pedestrians, just for—obviously for officer-safety reasons." Defendant replied that he had a gun in his right front pocket. Without being asked, he leaned forward and put his hands on the hood of Borchers's car. Borchers handcuffed defendant and asked him if he had a license for the gun. Defendant replied that he did not. Borchers frisked defendant, took his identification, and confirmed that there was a gun in defendant's pocket. A check with dispatch revealed that defendant had an active warrant for his arrest. Borchers then took the gun from defendant, put it in the trunk of the squad car, and took defendant to the police station. While in the car, Borchers continued to question defendant and, after several minutes, gave him *Miranda* warnings. Defendant was ultimately charged with unlawful possession of a firearm.[2]

Before trial, defendant filed a motion to suppress "all evidence * * * obtained during his illegal seizure and the illegal search of his person, as well as fruits derived from his illegal seizure and/or illegal search of his person." He argued that Borchers questioned him and discovered the gun during an unjustified extension of the traffic stop. The state, for its part, maintained that the questioning and arrest were justified by the officer-safety exception to the warrant requirement. The court denied defendant's motion.[3] He was subsequently tried and convicted.

On appeal, defendant amplifies the argument he made below, reasoning that the dispositive rule of law is that, although defendant was a pedestrian when Borchers encountered him, the encounter was a traffic stop because its purpose was to cite defendant for a violation of the traffic code[4] and, shortly after the encounter began, defendant

---

[2] He was also charged with, and acquitted of, possession of a loaded firearm in public.

[3] The court clarified that evidence obtained between the time when defendant was handcuffed and when he was given *Miranda* warnings was inadmissible, and the state does not cross-assign error to that ruling.

[4] On appeal, the state agrees that "Borchers stopped defendant for a traffic violation." We therefore do not address whether that assertion is correct. *See State v. Klein*, 234 Or App 523, 228 P3d 714 (2010) (treating bicyclist's violation of a traffic rule as a traffic violation).

knew that as well.[5] In such situations, defendant argues, the police officer must proceed to execute the citation and cannot make any inquiry that is unrelated to the traffic violation unless there is reason to suspect the stopped person of a separate crime to which the additional inquiry relates, the inquiry occurs during an unavoidable lull in the processing of the citation (such as occurs when the officer is awaiting information from dispatch), or some exception to the warrant requirement (such as officer-safety) justifies the inquiries. Such inquiries amount to an unlawful extension of the stop. According to defendant, that rule of law derives from *State v. Rodgers/Kirkeby*, 347 Or 610, 227 P3d 695 (2010). Defendant then proceeds to argue that Borchers did not have reasonable suspicion of an additional crime involving weapons, there was no unavoidable lull, and, under the totality of the circumstances, the officer-safety exception did not apply.

The threshold issue, then, is whether defendant correctly characterizes the holding in *Rodgers/Kirkeby*. That is not a simple question, because *Rodgers/Kirkeby* appears to point simultaneously and with equal vigor in opposite directions. On the one hand, it asserts that

> "police inquiries during the course of a traffic stop * * * are not searches and seizures and thus by themselves ordinarily do not implicate Article I, section 9. However, police conduct that involves physical restraint or a show of authority that restricts an individual's freedom of movement typically does implicate Article I, section 9."

*Id.* at 622. That statement implies that Borchers did not violate Article I, section 9, by asking defendant if he was carrying a weapon, because at the time of the inquiry, Borchers had not yet physically restrained defendant or limited his freedom of movement by virtue of a show of authority. On the other hand, *Rodgers/Kirkeby* also distinguishes between traffic stops and ordinary police-citizen encounters:

> "[I]n contrast to a person on the street, who may unilaterally end an officer-citizen encounter at any time, the

---

[5] Borchers testified, "The first thing I did is introduced myself and gave him the reason for the contact, because he had committed a violation so I was contacting him. It was not just a field interview."

reality is that a motorist stopped for a traffic infraction is legally obligated to stop at an officer's direction, *see* ORS 811.535 (failing to obey a police officer) and ORS 811.540 (fleeing or attempting to elude a police officer)."

*Id.* at 622-23. The inference we draw from this distinction is that a key factor in distinguishing police-citizen encounters that do not implicate any constitutional rights from encounters that do, is whether the citizen is legally obligated to remain in the police officer's presence, that is, may *not* "unilaterally end" the encounter. That inference supports the proposition that the encounter between Borchers and defendant *did* implicate Article I, section 9.

The court's ultimate disposition of the *Rodgers/ Kirkeby* case is equally ambiguous. The court notes that the arresting officer

"did not advise [the] defendant in any way that the traffic stop was at an end. * * * Defendant was not informed that he was free to go, and thus he had no way of knowing that [the officer's] questions and request to search the car were not part of the traffic investigation and that his cooperation in [the officer's] investigation was not required to continue."

*Id.* at 626. Again, the implication is that, because the defendant in *Rodgers/Kirkeby* correctly believed that he could not leave without violating the law, his movement was restricted and his Article I, section 9, rights were implicated. However, in the next sentence, the court states:

"Under the totality of the circumstances, we conclude that [the officer's] position at the driver-side window and [another officer's] presence on the passenger side of the car was a sufficient 'show of authority' that, in combination with the unrelated questions concerning the items in the car and the request to search the car, resulted in a significant restriction of defendant's freedom of movement."

*Id.* at 627. The implication of that language is that no Article I, section 9, issue arises without some show of authority that combines with the inquiries that are unrelated to the traffic violation. Finally, the court summarizes:

"Police authority to detain a motorist dissipates when the investigation reasonably related to that traffic infraction, the identification of persons, and the issuance of a

citation (if any) is completed or reasonably should be completed. Other or further conduct by the police, beyond that reasonably related to the traffic violation, must be *justified* on some basis other than the traffic violation.

"* * * Police conduct during a noncriminal traffic stop does not further implicate Article I, section 9, so long as the detention is limited and the police conduct is reasonably related to the investigation of the noncriminal traffic violation. However, a police search of an individual or a vehicle during the investigation of a noncriminal traffic violation, without probable cause and either a warrant or an exception to the warrant requirement, violates Article I, section 9."

*Id.* at 623-24 (emphasis in original). Again, the implication is that, if the detention is *not* limited and the police conduct is *not* reasonably related to the traffic violation, then Article I, section 9, *is* implicated. However, in the next sentence, the court states:

"Because police inquiries during a traffic stop are neither searches nor seizures, police inquiries in and of themselves require no justification and do not necessarily implicate Article I, section 9. However, police inquiries unrelated to a traffic violation, *when combined with physical restraint or a police show of authority*, may result in a restriction of personal freedom that violates Article I, section 9."

*Id.* at 624 (emphasis added).

One line of reasoning in *Rodgers/Kirkeby*, then, implies that a noncriminal traffic stop by its nature imposes a restraint on the person stopped because the person "is legally obligated to stop at an officer's direction," *id.* at 622-23, until the person is told that he or she is free to leave. Another line of reasoning implies that being detained in a noncriminal traffic stop does not, by itself, sufficiently restrain a person's liberty of movement so as to implicate Article I, section 9; there must be additional restraints or shows of authority. Resolving this ambiguity is consequential in the present case. Although Borchers approached defendant while defendant was a pedestrian and not a motorist, Borchers did so because defendant had committed a noncriminal traffic offense, and defendant was so informed before Borchers asked about weapons. Thus, when Borchers

made an "inquiry unrelated to the traffic violation," the only restraint on defendant—the only show of authority by Borchers—derived from the fact that he was being detained for a noncriminal traffic violation and had not been told that he was free to go. If that situation was sufficient to trigger Borchers's obligation to refrain from making unrelated inquiries, then Borchers violated defendant's right under Article I, section 9, unless he had reasonable suspicion to believe that defendant was guilty of criminal activity to which the inquiry was relevant, the inquiry occurred during an unavoidable lull in the citation-writing process, or some exception to the warrant requirement applied. If, however, additional indicia of authority or additional restraints on defendant's liberty of movement were required in order to trigger Borchers's obligation to refrain from making unrelated inquiries, no Article I, section 9, concerns arose until Borchers handcuffed defendant, which occurred *after* Borchers asked defendant about weapons in which case the question itself was not unlawful.

Some language in *Rodgers/Kirkeby* to the contrary notwithstanding, we conclude that, when a person is approached by a police officer—whether the person is in an automobile, on a bicycle, or on foot—for committing a noncriminal traffic violation, and the police officer and the person know that is the basis of the stop, then the officer who has approached the person must proceed to process the traffic violation, and may not launch an investigation into unrelated matters unless the inquiries are justified by reasonable suspicion of the unrelated matter, the inquiry occurred during an unavoidable lull in the citation-writing process, or some exception to the warrant requirement applies. *Accord State v. Pichardo*, 263 Or App 1, 326 P3d 624 (2014). To hold otherwise would require us to ignore the fundamental premise underlying *Rodgers/Kirkeby*: that traffic matters are different from ordinary police-citizen encounters because a person in an ordinary encounter with a police officer on the street "may unilaterally end an officer-citizen encounter at any time" (according to the Supreme Court), whereas a person detained for a traffic violation "is legally obligated to stop at an officer's direction." *Rodgers/Kirkeby*, 347 Or at 623-24. It would also

require us to endorse the proposition that a person who is stopped for a traffic violation and, for that reason, is *not* free to leave the scene, has not been "stopped" for purposes of Article I, section 9. The absurdity of such a proposition is self-evident. Neither this court nor the Supreme Court has ever referred to a traffic *stop* as a traffic *conversation. See State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991) ("mere conversation" between officer and citizen does not implicate Article I, section 9; "stop" does). The proposition also runs counter to the Supreme Court's authoritative statement that a person is stopped for purposes of Article I, section 9, when, "[e]xplicitly or implicitly, an officer [conveys] to the person with whom he [or she] is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *State v. Backstrand*, 354 Or 392, 401-02, 313 P3d 1084 (2013). Here, by informing defendant that he was being detained on a traffic violation, Borchers conveyed to defendant, at least implicitly, what was in fact the case: Defendant was not free to "terminate the encounter or otherwise go about his ordinary affairs." *Id.*

That being the case, we conclude that, when Borchers asked defendant if he was carrying any weapons, that inquiry—unrelated to the traffic violation—violated defendant's right under Article I, section 9, unless Borchers had reasonable suspicion that defendant had committed or was committing a crime, the inquiry occurred during an unavoidable lull, or an exception to the warrant requirement applied. The state does not argue that Borchers had reasonable suspicion of criminal activity when he asked defendant about weapons, or that there was an unavoidable lull. Rather, it argues that the trial court was correct to conclude that Borchers's inquiry was lawful under the officer-safety exception to the warrant requirement. Under that exception, an officer is permitted to take

> "reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). In deciding whether the exception applies, we are to "examine the totality of the circumstances as they reasonably appeared to the officer[] at the time." *State v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004).

When Borchers made the unrelated inquiry involving weapons, he was, according to the state, aware of the following relevant facts:

> "[(1) H]e knew the area of the stop as a high-crime area with gang activity. [(2)] When he turned his cruiser around and approached defendant, defendant looked at the trooper and quickly began to leave, as if he had something to hide. [(3)] Trooper Borchers knew that gang members in the area wore baggy gray pants and white shoes, like the pants and shoes defendant wore. [(4)] He saw that defendant wore an extremely baggy jacket and pants, which would have allowed defendant to hide numerous weapons. [(5)] When he made contact with defendant, Trooper Borchers was alone. [(6)] There were several people in close proximity, the trooper did not know the relationship between defendant and those people, and the situation caused him to fear that he might be caught in the middle of a gang confrontation."

While we are sensitive to our obligation not to "uncharitably second-guess" the officer's judgment, *Bates*, 304 Or at 524, we conclude that these facts do not create a "reasonable suspicion" that officer-safety was at risk. Addressing the state's facts point by point: (1) Although confronting a suspect in a high-crime area can contribute to officer-safety concerns, *State v. Amaya*, 336 Or 616, 631-33, 89 P3d 1163 (2004), such a location has never been regarded as sufficient to support the officer-safety exception unless there were also a significant number of other indicia of danger.[6] As we explain below, the situation here is not of that order. Further, Borchers confronted defendant at mid-day and at a busy commercial intersection. High-crime areas take on significance especially at late hours, in darkened

---

[6] We need not address the question of whether an officer's testimony that a particular location is a "high-crime" area requires anything more than the officer's assertion to that effect because, in this case, the testimony was not challenged.

areas, where the officer has recently encountered armed gang members. *State v. Miglavs*, 337 Or 1, 13, 90 P3d 607 (2004). None of those circumstances was present here.

(2) Even if defendant's departure from the scene when he saw Borchers approaching could be seen as an indication that defendant "had something to hide"—a dubious inference at best—that fact would not provide support for the inference that defendant presented an immediate *danger* or threat to Borchers's safety.

(3) Borchers never testified that he knew that defendant wore clothing similar to a gang member's. Rather, he testified that he "did not know for sure" if that was the case. Further, in *Miglavs*, 337 Or at 13, the Supreme Court stated, "[C]lothing that announces a gang affiliation does not, by itself, give rise to the kind of individualized suspicion of a safety threat required under Article I, section 9." Such clothing created a legitimate suspicion in *Miglavs* for several reasons: The officers had no doubt that the clothing indicated gang affiliation because the defendant's shirt bore the name of what the officer knew to be a local gang, and one of the defendant's companions had what the officer recognized as a gang tattoo. None of those circumstances was present in this case.

(4) Defendant's baggy clothing cannot be considered in determining the reasonableness of Borchers's suspicion because it became a concern of Borchers only *after* he learned, as a result of his inquiry, that defendant had a gun.[7] Further, like gang-affiliated clothing, it is not, by

---

[7] The relevant testimony was:

"[PROSECUTOR]: So you asked him if he had a gun. He leaned up against the car. What happened at that point?"

"[BORCHERS]: At that point in time, for my safety and his safety, I detained him. I put him in handcuffs and asked him if he had any more weapons on him. His clothes were so big and so baggy, and already knowing that he had one firearm on him, I suspected he could possibly have more weapons that would be easily concealed in the—the baggy clothing.

"* * * * *

"[PROSECUTOR]: What's going on around you at this point?

"[BORCHERS]: At this point, there have been a number of people that have come to the bus stop. They'd either crossed the street later after [defendant]. They had waited for the Walk sign. I believe another bus had come on Division Street. Some people got off, people are transferring bus lines, and

itself, sufficient to create a reasonable suspicion of a threat to officer-safety. *Id.*

(5) The fact that Borchers was alone is relevant, but we are unable to conclude that it is of major significance.

(6) As with the baggy clothes, so with the observers. Borchers did not notice the people until after he had questioned defendant about weapons.[8] Even then, according to Borchers's more specific testimony, the number did not exceed around "six to eight" people.

In sum, the relevant facts boil down to these: At the time that he began questioning defendant about weapons, Borchers, in broad daylight, at a busy intersection in a commercial neighborhood in Portland where unspecified "gang activity" occurred, confronted defendant, whom he had seen jaywalking. Defendant started to walk away from the intersection when Borchers arrived, but stopped when Borchers asked him to do so. Defendant was wearing some clothing that Borchers thought might indicate gang affiliation. Defendant was neither uncooperative nor evidently hostile. We conclude that these facts are not sufficient to create in Borchers's mind a reasonable suspicion that defendant presented a risk to Borchers's safety.[9] Thus, Borchers's initiation of questioning unrelated to the traffic stop was not justified by reasonable suspicion of a crime in addition to the traffic violation, the questioning did not occur during an unavoidable lull in the process of citing defendant, and no exception to the warrant requirement existed. We therefore reverse and remand.[10]

Reversed and remanded.

---

suddenly, I noticed there—I don't remember the exact number, but it was approximately six to eight people standing around the bus stop, all looking directly at us."

[8] *See* 263 Or App at 160-61 n 7.

[9] Borchers himself testified that, although he stopped defendant for committing a noncriminal traffic violation, he routinely asked everybody that he stopped if they had weapons.

[10] The state does not contend that the discovery of an outstanding warrant for defendant's arrest attenuated the discovery of evidence from the constitutional violation. We note that no case holds or implies that discovery of a warrant purges the taint of a prior constitutional violation so as to render admissible evidence discovered *before* the discovery of the warrant.