**UNITED STATES of America**

v.

**Peter Michael AMOROSO, Defendant**

**No. CR. 02–120–P–C.**

United States District Court,
D. Maine.

April 4, 2003.

---

David R. Collins, Office of the U.S. Attorney, Halsey B. Frank, Office of the U.S. Attorney, Portland, for USA.

Peter E. Rodway, Rodway & Horodyski, Portland, for Peter Michael Amoroso (1).

## MEMORANDUM OF DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Senior District Judge.

Now before the Court is Defendant's Motion to Suppress (Docket Item No. 5) evidence seized from his person on October 4, 2002. Defendant contends that law enforcement authorities' detention of him on that date was in violation of the Fourth Amendment to the United States Constitution and that the evidence seized from him as a result of that detention should be suppressed pursuant to the Fourth Amendment's exclusionary rule. An evidentiary hearing was held before the Court on January 22, 2003, after which counsel filed post-hearing memoranda. After careful consideration of the record before it, the Court finds that both the stop and the seizure of evidence were illegal and will grant Defendant's Motion to Suppress.

## I. Facts

On the evening of October 3, 2002, Sergeant James Sweatt of the Portland Police Department's Tactical Enforcement Unit [1] set up a surveillance position of plainclothes officers in front of a group of bars in the Old Port of Portland on Wharf Street, known to be frequented by an area motorcycle gang.[2] Transcript of Proceedings ("Transcript") at 33:16–19; 30:14–20. The surveillance team was set up as part of an ongoing effort on the part of the Portland Police Department to monitor gang activity in Portland since the escalation of gang tensions beginning in May 2002. Id. 32–22. According to Sergeant Sweatt, since the late spring of 2002, gang activity in Portland had been on the rise, due to the arrival of members of a chapter of a motorcycle gang known as the Outlaws. Before their arrival, the only gang with a marked presence in Portland was the Iron Horsemen. Id. 9:2–6. With the

---

1. As part of the Tactical Enforcement Unit, Sergeant Sweatt testified that he normally works from 6:00 p.m. to 2:00 am, Wednesday through Saturday, concentrating on gang activity and the surveillance of such activity. Transcript of Proceedings at 7:3–5.

2. Sergeant Sweatt explained that these particular bars were known hangouts of members of the Outlaw motorcycle gang, while "An-gie's Bar," a few blocks away, was known to be the hangout of the rival Iron Horsemen motorcycle gang. Transcript 16:15–18; 30:14–20. Sergeant Sweatt also indicated that the Iron Horsemen were starting to appear at the Outlaw bars when in the past they had never gone into them, perhaps "looking for some confrontations." Id. 30:16–20.

advent of the rival Outlaw gang, however, a struggle arose between the two gangs to exert "control" over the Portland area.[3] *Id.* 11:17–20. Throughout the summer of 2000, Sergeant Sweatt testified that authorities stopped gang members on almost a daily basis, and they recovered numerous weapons such as handguns, hammers, clubs, knives, swords, etc. *Id.* 13:1–6; 14:1–4. In fact, according to Sergeant Sweatt, prior to the night of October 3, 2002, only once did a search of a gang member fail to uncover some kind of weapon. *Id.* 14:23–25. Because of the increasing tensions and pattern of gang activity, police bulletins were often published warning officers to consider all gang members armed and dangerous. *Id.* 31:14–20.

Around 10:00 p.m. on the evening of October 3rd, Sergeant Sweatt observed members of the Outlaw motorcycle gang beginning to arrive at the bars on Wharf Street. *Id.* 33:19–22. In all, approximately fifteen to twenty Outlaw gang members were seen entering one of the bars. *Id.* 34:1–2. Additionally, Sergeant Sweatt testified that on this particular evening, a well-known and notorious Outlaw member was thought to be in town. *Id.* 34:3–7. Sergeant Sweatt explained that this individual was suspected by the rival Iron Horsemen of having been the gunman in a shooting of two of its prospective members.[4] 34:21–24. Sergeant Sweatt indicated that there were rumors circulating that the Iron Horsemen had threatened to kill this individual and that, in turn, the Outlaws had threatened to kill the leader of the Iron Horsemen. *Id.* 35:3–7.

Sometime after 12:30 a.m., in the early morning of October 4, around the time the bars were closing, a large fight broke out involving gang members in the area that had been under surveillance. *Id.* 36:11–15. Sergeant Sweatt and his other plainclothes officers, having recently moved away from the bars and toward where the gang members were known to park their motorcycles, awaited the arrival of uniformed officers before reentering Wharf Street. *Id.* 36:16–19. Upon their arrival, the gang members had all already dispersed. *Id.* 36:19–20. However, "[s]everal people [were] yelling, screaming, you know, there was a gang fight, several persons were bleeding, they were uncooperative." *Id.* 36:20–22. The officers set out to try to locate gang members, with Sergeant Sweatt providing to dispatch officers a rough description of the Outlaw gang members who had been present moments earlier. *Id.* 36:23–37:1. Several Outlaw members were located, and weapons were confiscated. *Id.* 36:2, 10–12. No Iron Horsemen were known to have been involved in the fight. *Id.* 60:20–25; 61:8–10.

Sergeant Sweatt and another officer then proceeded to drive down Commercial Street, a main thoroughfare in the Old Port, in an unmarked car. The officers drove in the direction of the bar known to be frequented by the Iron Horsemen, Angie's Bar, in order to determine if there was any other gang activity afoot, and to look for any people suspected of having been involved in the recent fight. *Id.* 38:1–4, 15–17. Approximately forty-five minutes after the fight on Wharf Street, *id.* 62:8–9, the officers passed Angie's, and Sergeant Sweatt noticed Defendant Peter Amoroso walking along the street, accom-

---

**3.** In fact, after one fight between the Outlaws and the Iron Horsemen, the leader of the Iron Horsemen vowed to "defend themselves at whatever cost that meant." Transcript 25:7–8.

**4.** In fact, he was thought to be the gunman in the shooting of two Hell's Angels prospective members. The Hells Angels are affiliated with and directly control the Iron Horsemen. Transcript 9:20–25.

panied by a couple of women and one other person and wearing his Iron Horsemen jacket. *Id.* 38:25–39:3.

Sergeant Sweatt had known Defendant since July of 2002, and he knew him to be a prospect for the Iron Horsemen.[5] *Id.* 15:22–16:33; 20:3. He also knew that recently, Defendant had informed him that he was fearful that a member of the Black Pistons, an affiliate of the Outlaws, was "coming after him" after a fight between the two of them *Id.* 26:22–27:2. Sergeant Sweatt testified that he and the other officer passed Defendant and his companions and then turned left on a side street, with Defendant and his companions then crossing over the street behind where the officers had just turned. *Id.* 39:11–12. Sergeant Sweatt indicated that he made eye contact with Defendant and then lost sight of him for approximately ten seconds as they went around the block. *Id.* 39:13–16; 40:11–13; 40:18–22. Before he lost sight of Defendant, Sergeant Sweatt testified that he was approximately twenty feet away from him. *Id.* 39:17–23. Upon rounding the block and traveling back down to Commercial Street, Defendant was just approaching the street the officers were driving down, and Sergeant Sweatt noticed that Defendant had removed his Iron Horsemen jacket and thrown it over his shoulder. *Id.* 40:24–41:3; 41:14–16. Intending to speak briefly with Defendant, Sergeant Sweatt pulled directly in front of Defendant's path of travel, approximately twenty feet away from him. *Id.* 64:7–9; 41:13; 65:16–17. Sergeant Sweatt indicated on cross-examination that Defendant was at that point a suspect in the earlier bar fight. *Id.* 65:25.

Defendant then approached the passenger side of the car,[6] an action that made Sergeant Sweatt nervous because he had no access to his firearm, impact weapons, or other type of protection. *Id.* 41:18–19; 41:25–42:2. For these reasons, Sergeant Sweatt quickly exited the car, an action which prompted Defendant to throw his hands up in the air and say something to the effect of, "Come on, Sweatt." *Id.* 42:2–5. Sergeant Sweatt testified that he was concerned by Defendant's demeanor because, in the past, "[e]very time I dealt with Mr. Amoroso, he's been pretty calm and direct. He's never given us a hard time. He's always answered our questions as much as he would." *Id.* 42:9–11. Sergeant Sweatt "began to wonder why [Defendant] wasn't cooperating," and he ordered him to come around the car. *Id.* 42:19–20. At his first command, Defendant did not comply, but when Sergeant Sweatt ordered him a second time to come around the car, he did so, with his hands up in the air. *Id.* 42:20–23. Sergeant Sweatt then asked Defendant if he had any weapons on him, and Defendant affirmed that he did have "a piece." *Id.* 42:24–25. When Sergeant Sweatt asked Defendant what the piece was, he replied that he had a handgun in his waistband. *Id.* 42:25–43:1. At that point, Sergeant Sweatt ordered Defendant to put his hands on the car and, with his weapon drawn, instructed the other officer to remove the gun from

5. A "prospect" of a motorcycle gang is a new member attempting to pledge into the gang. Transcript 10:7–8.

6. Sergeant Sweatt testified that Defendant then "voluntarily walked up to the car." *Id.* 64:16–17. The record is ambiguous as to whether Defendant, in fact, "voluntarily" walked up to the car or whether Sergeant Sweatt called him over and Defendant then approached the car. Either way, with what he knew to be a police vehicle pulled directly in front of his path, it seems to be a reasonable and unthreatening course of conduct for Defendant to continue to approach the vehicle.

Defendant's waistband, which he did. *Id.* 43:4–12; 46:4.

## II. Discussion

■■■ To justify an investigatory stop, an officer need not have evidence that rises to the level of probable cause; nonetheless, he must have a reasonable and articulable suspicion to do so. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "The requirement that the officers' suspicion be articulable prevents the police from stopping a person on the basis of pure, even if inspired, hunch." *United States v. Feliciano,* 45 F.3d 1070, 1072 (7th Cir.1995). In examining the lawfulness of an investigative stop, the reviewing court "must undertake a contextual analysis using common sense and a degree of deference to the expertise that informs a law enforcement officer's judgments about suspicious behavior." *United States v. Cook,* 277 F.3d 82, 85 (1st Cir.2002) (*Citing United States v. Chhien,* 266 F.3d 1, 6 (1st Cir.2001)).

Sergeant Sweatt's stop of Defendant in this case was made against the general backdrop of escalating gang activity and tensions between rival gangs in Portland. Specifically, the stop was made against the backdrop of the recent melee less than one hour earlier involving gang members. Additionally, Sergeant Sweatt knew of Defendant's membership in the Iron Horsemen, that Defendant in the past had been involved in a fight with an Outlaw and had said that he feared reprisal, that a notorious Outlaw member whom the Iron Horsemen had supposedly threatened to kill was allegedly in town, and that the Iron Horsemen had vowed to defend themselves at any cost. Finally, Sergeant Sweatt believed Defendant to be behaving strangely on that evening. According to the Government, all of this points to reasonable suspicion for Sergeant Sweatt to have made the stop in question.[7]

■■■ The Court finds, however, that the record fails to reveal any concrete evidence upon which to base an articulable and reasonable suspicion that Defendant was involved in criminal activity. First, there was no evidence that the gang fight that evening involved any members of Defendant's gang, much less Defendant himself. Sergeant Sweatt stated that the officers "could not disprove" that the Iron Horsemen were involved in that fight, Transcript 61:11–13, but that there was a "good chance" that "some gang members" were involved. *Id.* 61:19–20. However, without more to tie Defendant, or at the very least his gang, to the fight, Sergeant Sweatt's suspicion that Defendant was involved in that fight was nothing more than an inspired hunch, and it did not rise to

---

7. In its brief, the Government also lists several other factors that it claims gave Sergeant Sweatt reasonable suspicion to stop Defendant. These factors include: (1) Prior to September 20, 2002, two independent informants called the police and reported that a man named Peter Amoroso and matching Defendant's description was selling ecstasy pills and that he carried them in his Iron Horsemen vest on the right side. Transcript 21:25–22:4.(2) On September 20, 2002, when Portland police officers were at Angie's Bar seeking to arrest another Iron Horsemen prospect, Defendant was present inside the doorway of Angie's, and when police officers closed the door after arresting the other Iron Horsemen prospect, Defendant tried to open the door, but "offered no serious resistance to try to interfere with the arrest at that time." *Id.* 18:15–19.(3) On September 28, the police received a call indicating that an Iron Horsemen was at one of the Wharf Street bars carrying a gun. *Id.* 29:22–25; 58:15–17. It was never determined who this Iron Horseman was. *Id.* 58:19–59:1. The Court finds that these factors are irrelevant as far as connecting Defendant to the specific incident in question on the morning of October 4, 2002, and, therefore, will not consider them as a basis of reasonable suspicion.

the level of articulable suspicion.[8] While the Court recognizes Sergeant Sweatt's extensive experience in dealing with motorcycle gangs in Portland and his in-depth knowledge of the escalating turf war between the Outlaws and the Iron Horsemen, especially during the period in question, this knowledge and experience, without specific evidence to show that on the occasion in question Defendant was involved, Sergeant Sweatt could not have had an articulable suspicion of criminal activity when he stopped Defendant.[9]

Furthermore, the Court does not agree with the Government that Defendant's behavior on the night in question was particularly suspicious. Sergeant Sweatt testified that Defendant did not quicken his gait in any way upon seeing the officers, and it appeared that he made no effort to evade them. In fact, he proceeded directly to the vehicle when the officers pulled it into his path in a blocking position. *Id.* 63:6–7; 63:23. Although Sergeant Sweatt testified that this action made him nervous, he also testified that he called Defendant over to the car. Hence, Defendant's conduct in approaching the car at the officer's request cannot be described as either threatening or suspicious. Sergeant

Sweatt also testified that he thought it suspicious that Defendant removed his Iron Horsemen vest and threw it over his shoulder after first seeing the police officers. *Id.* 41:12.[10] However, it does not appear that Defendant, in fact, attempted to dispose of the jacket or to hide it from Sergeant Sweatt. Without more, simply throwing it over his shoulder is not an objectively suspicious action. *See Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (officer must have particularized and objective basis for suspicion).

Sergeant Sweatt's description of Defendant as exhibiting a "defensive posture" is also unconvincing to the Court. Transcript 67:3. Sergeant Sweatt explained that Defendant "didn't want to come around to the car," and that he had to command him twice before he did so. *Id.* 67:6; 42:20–23. Just because Defendant did not immediately jump to run around the car the second he was commanded to do so does not seem to the Court to be inherently suspicious. He did act upon the second command, and he did so with his hands raised, a decidedly non-offensive posture. *Id.* 42:23.

---

8. Of particular import to the Court on this issue was the exchange between Sergeant Sweatt and the Court during the evidentiary hearing. When asked by the Court what specific information he had that led him to believe that Defendant was involved in the earlier gang fight, Sergeant Sweatt replied that "[o]ther than his membership in a gang and the experience that I've dealt with, there was no other specific thing." Transcript 66:11–12.

9. *Compare United States v. Daniel,* 804 F.Supp. 1330, 1335 n. 10 (D.Nev.1992) ("One's status as a gang member, however, even a gang member with a known arrest or conviction record, does not, without more, create the reasonable and articulable suspicion necessary to justify an investigative de-

tention"), *with Feliciano,* 45 F.3d at 1074 ("Knowledge of gang association and recent relevant criminal conduct ... is a permissible component of the articulable suspicion required for a *Terry* stop."). This Court does not dispute that such knowledge may be a *component* of the required articulable suspicion, but it must be accompanied by something more to ensure that an officer has a "particularized and objective basis" for suspicion. *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

10. Sergeant Sweatt explained that he thought that action unusual because he had "never seen any of the gang members remove their colors in public or anywhere in a way that they concealed them or covered up what they were." Transcript 41:7–9.

Therefore, given the lack of concrete evidence supporting an articulable and particularized suspicion that Defendant was involved in criminal activity, this stop went beyond the strictures of the Fourth Amendment, and any evidence seized as a result must be suppressed.

### III.  Conclusion

For the foregoing reasons, the Court **ORDERS** that Defendant's Motion to Suppress be, and it is hereby, **GRANTED.**