Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# OPINION

No. 04-09-00650-CR

Quentin Jamal **PARKS**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No 12, Bexar County, Texas
Trial Court No. 274015
Honorable Michael E. Mery, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:    Catherine Stone, Chief Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  October 27, 2010

REVERSED and REMANDED

Appellant Quentin Jamal Parks was charged with unlawfully carrying a weapon.  After the trial court denied Parks's motion to suppress, he entered a no contest plea and was sentenced to one year in jail, suspended for one year, and fined $300.00.  Parks appeals the judgment, arguing the trial court erred in denying the motion to suppress because the investigative detention that lead to the discovery of the weapon was not supported by reasonable suspicion.  We agree, reverse the judgment, and remand the case to the trial court for further proceedings.

**BACKGROUND**

During the hearing on the motion to suppress, San Antonio Police Officer Reed Hensley testified that he and his partner were on patrol in a marked police vehicle on November 23, 2007. At approximately 9:30 p.m., Officer Hensley saw Parks and three other individuals walking behind some stores in a strip mall. He testified the men were near the back doors of the building, but they did not approach any of the doors or try to open any of them. Officer Hensley used his car's spot light to illuminate the four men and he noticed they had blue rags hanging from their pockets. Officer Hensley testified that from his nine years of experience on the police force, he knows gang members will "fly their colors," and he associates blue rags with gang members. None of the group altered their walking direction or style in response to the approaching officers. According to Officer Hensley:

> We drove over to where the individuals were and we got out of the car and asked them to place their hands on the car because they're in a dark area, we don't know them. I suspect they're gang members. Gang members are known to carry weapons to protect themselves from other gangs and to protect narcotics.

When asked what specific words he used, Officer Hensley testified he said:

> How are you doing this evening? . . . What are you doing back here? . . . Would you mind coming over to the car where the light is so we can see you?

On cross-examination, Officer Hensley confirmed he told the men to put their hands on his car, but stated it was not the first thing he said to them. The officer testified he used an authoritative tone with the men, and that he would have stopped them if they had not responded to his statements. Officer Hensley testified that most of the group responded appropriately, but:

> the defendant took one or two steps backward and started looking around. I thought he was going to run, so I repeated my request and he walked over and put his hands on the hood [of the patrol car].

The officer decided to frisk Parks "because the way he acted I thought he might have something illegal on him:"

> I frisked the defendant because when he took two steps back and started looking for somewhere to run the — the blue rags hanging from his pocket, I thought that he might have a weapon or drugs on him which would give him cause to run. It's my experience that, you know, when individuals look to get away, they have something they're not supposed to have, and in this case, it happened to be a gun.

During the pat-down, Officer Hensley found a gun in Parks's pocket, and he arrested Parks for unlawfully carrying a weapon.

Officer Hensley testified he could not recall anyone in the group making furtive gestures, and none of them made any threats. None of the group was smoking or passing anything, and the officer did not observe any of the men engage in any criminal activity. He had no prior knowledge about any person in the group. Officer Hensley explained that he "wanted to find out who they were and what they were doing behind a business." He testified he had no specific information any of the group was armed or was a member of a gang, other than the presence of the blue rags. The officer testified that all the men were similarly dressed, and described Parks's clothing as a "black hoodie, a sweatshirt, a black shirt, blue jeans, [and] black shoes." There was no testimony that the clothing was emblematic of any gang membership.

One of the men from the group, Jonathan Wright, testified that he, Parks, and Parks's brother Randall worked at a Jim's restaurant that day. They were still dressed in their uniforms and were accompanied by Denzel Coleman when stopped by the police. The group was taking a shortcut from a nearby convenience store to his apartment. Several of the group had sweat rags that they used bussing the tables at Jim's. He testified that his rag would not have been visible to the police, but he was not sure whether any other member of the group had a rag visible. Wright

testified that the police car approached them at a fast speed and the police immediately told them to put their hands on the car. Wright did not feel free to leave.

After a hearing on Parks's motion to suppress, the trial court denied the motion and made oral findings and conclusions. The court's findings of fact included:

- There were lights illuminating the scene that night but it was still dark.
- The group was stopped in the parking lot rather than next to the building.
- Officer Hensley was a credible witness.
- The officer saw blue rags on at least some of the men.
- It is "extremely unusual" to have a blue rag to wipe your face.[1]
- It is "highly unusual" to have multiple people with blue rags hanging down.[2]
- The clothing and the rags worn by the group "met" gang identifiers or markers.[3]
- Parks "kind of stepped back and looked as if he was seeing that maybe he was going to run or whatever."
- When the officer discovered the weapon during the frisk, it was readily apparent to the officer that the object was a handgun.

In addition, the trial judge stated he was "not saying that [Jonathan Wright] is not credible." The trial court concluded:

- The officers had a right to approach the group to investigate.
- The officers found the men in a suspicious place under circumstances which reasonably showed the men could be about to commit some offense.
- Parks's actions (looking around as if he was going to run) justified the pat-down search for weapons because "they appeared to meet the description of potential gang members who are known to carry weapons."

### STANDARD OF REVIEW

We review the trial court's ruling on a motion to suppress under an abuse of discretion standard. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). We view the record in the light most favorable to the trial court's ruling and will reverse only if the ruling is outside the zone of reasonable disagreement. *Id.* We give almost total deference to the trial court's determination of historical facts, especially those based on an evaluation of the witnesses'

---

[1] There was no testimony on this point.
[2] There was no testimony on this point.
[3] There was no testimony that the clothing was identified with any gang.

credibility and demeanor. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We review de novo the trial court's application of the law of search and seizure to the facts. *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007). We will sustain the trial court's ruling "if it is reasonably supported by the record and is correct on any theory of law applicable to the case." *Dixon*, 206 S.W.3d at 590.

### APPLICABLE LAW & DISCUSSION

Parks argues the trial court should have granted his motion to suppress because the officers did not have reasonable suspicion to detain or to search him. To decide these issues, we must first determine whether the officers' initial interaction with the men was a consensual encounter or an investigative detention.

### *Encounter or Investigative Detention?*

"An encounter takes place when an officer approaches a citizen in a public place to ask questions, and the citizen is willing to listen and voluntarily answers." *Crain v. State*, 315 S.W.3d 43, 49 (Tex. Crim. App. 2010). Police do not need any articulable cause to initiate an encounter because an encounter does not implicate the Fourth Amendment. *Id*. "On the other hand, an investigative detention occurs when a person yields to the police officer's show of authority under a reasonable belief that he is not free to leave." *Id*. An officer must possess reasonable suspicion to initiate an investigative stop. *Davis v. State*, 947 S.W.2d 240, 244-45 (Tex. Crim. App. 1997). In determining whether an interaction was an encounter or a detention, the court:

> focuses on whether the officer conveyed a message that compliance with the officer's request was required. The question is whether a reasonable person in the citizen's position would have felt free to decline the officer's requests or otherwise terminate the encounter.

*Crain*, 315 S.W.3d at 49. The Court of Criminal Appeals has identified several factors to consider in determining whether an investigative detention has occurred: the threatening presence of several officers; display of a weapon by an officer; some physical touching by police; and the *use of language or tone of voice* indicating compliance with the officer's request might be compelled. *Id.* at 49-50 (emphasis in the original) (citing *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980)).

The issue in *Crain* was whether an officer's encounter with the defendant was a consensual encounter or an investigative detention. The officer testified he was in his patrol car, responding to a call for service at about 12:30 a.m., when he first observed the defendant walking in a residential neighborhood. As he drove by, the officer saw the defendant "grab" at his waist. *Id.* at 46. The officer proceeded to his call and returned approximately ten minutes later to look for the defendant. *Id.* When the officer found the defendant walking across a yard, he called out to the defendant and "asked him to come over and talk." *Id.* The officer also shined the patrol car's spotlight on the defendant. *Id.* The defendant took a few more steps and then stopped. *Id.* The officer acknowledged the request could have sounded as if it were an order. *Id.* The officer also testified that he would not have pursued the defendant if there had not been compliance with his request because the officer had not observed any criminal activity. *Id.* at 46-47. The officer exited his vehicle, and as he approached the defendant, the officer smelled what he believed to be the odor of marijuana coming from the defendant's clothes and breath. *Id.* When the defendant began to show signs of nervousness, the officer suspected the defendant was in possession of marijuana. *Id*. at 47. The officer walked the defendant towards the patrol car while holding the defendant's hands behind the defendant's back. *Id.* Another

officer arrived to assist, they frisked the defendant, and found a gun. *Id.* The defendant's motion to suppress the evidence was denied and he was convicted of a weapons charge. *Id.*

The Texas Court of Criminal Appeals held the initial encounter between the defendant and the officer in *Crain* was an investigatory detention:

> We . . . conclude that [the officer's] act of shining his patrol car's overhead lights in appellant's direction, coupled with his request-that-sounded-like-an-order, to "come over here and talk to me," caused the appellant to yield to [the officer's] show of authority ─ a reasonable person in the appellant's shoes would not have felt free to leave or decline the officer's requests. We thus hold that a detention occurred during the initial interaction between the appellant and [the officer]. Therefore, in order for that initial interaction to have been legal, [the officer] needed to have reasonable suspicion that the appellant was engaged in criminal activity at the time of his approach.

*Id.* at 53 (footnote omitted).

Applying the court's reasoning in *Crain* to the facts of our case, we hold the initial encounter between Parks and Officer Hensley was a detention. Officer Hensley initially used his spotlight to illuminate Parks. Although the court in *Crain* iterated its earlier holding in *State v. Garcia-Cantu*, 253 S.W.3d 236 (Tex. Crim. App. 2008), that the use of a spotlight does not always turn a consensual encounter into a detention, the court noted that it may be considered a factor in determining whether a person yielded to a show of authority. *Crain*, 315 S.W.3d at 51; *see also Garcia-Cantu*, 253 S.W.3d at 245 n. 43 (discussing numerous cases addressing use of police emergency and spotlights as possible show of authority). The men stopped when Officer Hensley drove to their location and issued his request/command that they walk over to the patrol car and place their hands on the car. Officer Hensley admittedly spoke the words in an authoritative tone. And although the subjective intent of the officer does not control the resolution of the issue, Officer Hensley testified that Parks was not free to disregard the request, suggesting the request/command was delivered in an authoritative manner. Finally, there were

two officers present during the encounter, both dressed in full uniform and armed. Although Parks did not immediately place his hands on the patrol car as instructed, he "yielded" to Officer Hensley's request/command by stopping his path of travel. Viewing the totality of the circumstances, a reasonable person would not have felt free to leave or to decline the officer's request. We therefore hold the initial interaction between the officers and Parks was a detention, not a consensual encounter.

### *Reasonable Suspicion?*

"Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in criminal activity." *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005). "Under this standard, the articulable facts on which the officer relied need only support a reasonable belief that activity out of the ordinary is occurring or has occurred, that the detainee is connected to the unusual activity, and that the unusual activity is related to crime." *State v. Garcia*, 25 S.W.3d 908, 912 (Tex. App.—Houston [14th Dist.] 2000, no pet.).

Officer Hensley did not testify there was any unusual activity relating to crime other than the presence of the blue rags. Although he testified the men were walking near the back doors of the businesses, Officer Hensley stated the group appeared to be walking past the location, no one appeared to be checking the doors to the businesses or the dumpsters, none of the group appeared to react to his presence by changing his manner of walk, no furtive gestures or gang hand signals were noted, nothing passed among the men, and the officer had no information that any of the group had a criminal record or was a gang member. The only factual circumstance the State appears to rely on to show reasonable suspicion is the presence of the blue rags. According to

Officer Hensley, gang members often "fly their colors," a blue rag signifies gang membership, and gang members often carry weapons to protect themselves or drugs. The State argues Officer Hensley could conduct a frisk either because he had reasonable suspicion Parks was engaged in criminal activity — presumably unlawfully carrying a weapon or possessing drugs — or to ensure officer safety during the investigative detention. Under either theory, reasonable suspicion must exist.

Viewing the totality of the circumstances, we conclude there was no reasonable suspicion. Unlike the well-known circumstances in *Terry v. Ohio*,[4] Officer Hensley testified the men did not devote their attention to the doors of the closed stores. The officer did not articulate any reason, based either on their location or their actions, to suspect the men were about to engage in criminal activity. The only evidence relating to suspicions of criminal activity was the officer's testimony that he suspected the men were gang members, and his experience taught him that gang members usually carry weapons or drugs. But that testimony does not rise above mere surmise or hunch. While the State correctly argues that gang membership may be a factor to be considered in determining if reasonable suspicion exists,[5] it has not cited any authority holding that gang membership alone provides reasonable suspicion for an investigative detention or a *Terry* frisk. Reviewing cases from other jurisdictions, it appears gang membership may be a factor in determining reasonable suspicion, but gang membership, alone, does not provide reasonable suspicion.

In *State v. Jones*, 835 P.2d 863 (N.M. Ct. App. 1992, cert. denied), the New Mexico court of appeals held that inferences from "gang membership and presence in a gang activity area" are

---

[4] 392 U.S. 1 (1968).

[5] *See, e.g. Molina v. State*, 754 S.W.2d 468, 473-74 Tex. App.—San Antonio 1988, no pet.) (officer could take gang membership into consideration when stopping group of men loitering near bus stop in tourist area that experienced a high incidence of crime related to tourism where group had several opportunities to board buses but failed to do so).

not sufficient by themselves to support reasonable suspicion. 835 P.2d at 867. In *Jones*, the police saw three individuals walking down the street in an area of high gang activity. *Id.* at 865. One of the men was known to the police as an avowed gang member and narcotics distributor. *Id.* Because the police frisked this person every time they encountered him, the man assumed a "frisk" position without being asked. *Id.* The defendant was not known to be a gang member, but he was wearing clothes and a particular brand of athletic shoe associated with a particular gang. *Id.* Because of his manner of dress, the area of town, and his being in the company of a known gang member, the police asked the defendant to assume the same stance, frisked him, and found a weapon. *Id.* Rejecting the State's argument that the frisk was permitted under *Terry*, the court held the trial court erred in denying the motion to suppress:

> However, in *Terry*, the officer who stopped the defendant suspected that he and his cohorts were inspecting a retail establishment for the opportunity to rob it. The officer suspected the defendant individually of being in the process of committing the particular crime of robbery. The officers in this case undoubtedly suspected defendant of being a gang member. Yet, they had only generalized suspicions that a gang member, not specifically defendant, had committed a litany of crimes. Their experience told them that a gang member, at any given time, is possibly engaged in a narcotics or weapons violation, or both. Yet, they had nothing connecting this individual defendant to a particular crime or crimes, except the likelihood that he was a gang member.

*Id.* at 867.

The Oregon Supreme Court has also addressed the issue of whether gang membership provides reasonable suspicion that a person poses a risk to an officer's safety and thus permits a frisk for weapons under the Oregon constitution.[6] In *State v. Miglavs*, 90 P.3d 607 (Or. 2004), a police officer stopped three individuals she suspected of violating a curfew. Because the officer was alone and the stop occurred in a dark parking lot, she requested assistance. 90 P.3d at 608.

---

[6]Although the court appeared to limit its analysis to its state constitution, the scope of a lawful investigative detention and protective frisk under the Oregon constitution appears to be the same as a *Terry* detention and frisk.

Two backup officers arrived and the police determined two of the individuals were free to go. However, they remained while the officer continued to investigate the third person for a possible curfew violation. *Id.* at 609. The officer became concerned for her personal safety because the individuals were wearing distinctive clothing that identified them as members of a specific urban gang, and members of that gang were known to carry weapons. *Id.* The Oregon court concluded the police had reasonable suspicion to frisk for weapons. *Id.* at 611-13. In reaching its conclusion, the court stated that neither a person's appearance alone nor "clothing that announces a gang affiliation" provides the individualized suspicion required to conduct a frisk for weapons. *Id.* at 613. The court emphasized that it was the officer's training and experience with the particular gang to which the defendant belonged and her knowledge of the weapon-carrying propensities of that gang, together with the circumstances of the detention, that provided the particularized suspicion sufficient to support the frisk. *Id.* at 613-14.

In *United States v. Amoroso*, 257 F.Supp.2d 310 (D. Me. 2003), the court held police did not have reasonable suspicion to perform an investigatory stop. The police were investigating a large gang fight. *Id.* at 312. About forty-five minutes after the fight, a police officer saw Amoroso walking down the street wearing his gang jacket. *Id*. at 312-13. The officer had prior dealings with Amoroso and knew he was a gang member. *Id*. at 313. The officer testified that tensions between rival gangs had been growing. *Id*. at 312. The earlier fight had involved several members of the rival gang, and police suspected, but had not confirmed, that members of Amoroso's gang had been involved. *Id.* Police had recovered weapons from some gang members involved in the fight. *Id.* The officer also testified that in the months preceding the fight, when police stopped gang members, they were always carrying a weapon. *Id.* The officer could only recall one instance when a gang member had not been armed. *Id.*

The officer parked his vehicle in front of Amoroso, and Amoroso approached the passenger side of the police car. *Id*. at 313. The officer testified this action made him nervous because it put him in a defensive posture. The officer exited his vehicle, which prompted Amoroso to raise his hands. *Id.* The officer ordered Amoroso to come around the car. *Id.* When Amoroso did not comply, the officer repeated his command, and Amoroso complied. *Id.* The officer asked Amoroso if he was armed, and he admitted he had a gun. *Id.* The district court granted Amoroso's motion to suppress, reasoning there was no reasonable suspicion Amoroso was involved in any criminal activity. *Id.* at 316. His gang membership, the fact gang members in that area were always armed, that a gang fight had just occurred in the vicinity, and Amoroso's failure to initially comply with the officer's command did not rise to the level of reasonable suspicion. *Id.* at 314-15.

We agree with the reasoning of the foregoing cases and hold Officer Hensley lacked individualized suspicion linking Parks to any criminal activity. The officer's testimony does not provide articulable facts linking Parks to any criminal activity or a weapon. Officer Hensley did not testify that any particular gang identified itself with similar blue rags, that such a gang was active in the area, or how he acquired his knowledge about the weapon-carrying propensities of that particular gang. Although the officer testified that he has come into "contact" with "gang members" at least once a day for the nine years he has worked as a police officer, he was never questioned about the basis for his testimony that he associated blue rags with gangs or how he acquired knowledge that "gang members" carry weapons.

### CONCLUSION

The trial court erred in denying the motion to suppress.  The judgment is reversed and the case is remanded to the trial court for further proceedings consistent with this opinion.


Steven C. Hilbig, Justice

Publish