OPINION

 

No. 04-09-00650-CR

 

Quentin Jamal PARKS,

Appellant

 

v.

 

The STATE of
Texas,

Appellee

 

From the County Court
at Law No 12, Bexar County, Texas

Trial Court No. 274015

Honorable Michael E.
Mery, Judge Presiding

 

Opinion by:   Steven C. Hilbig, Justice

 

Sitting:                     Catherine Stone, Chief Justice

                     Sandee
Bryan Marion, Justice

                     Steven
C. Hilbig, Justice

 

Delivered and
Filed:  October 27, 2010

 

REVERSED and
REMANDED

 

Appellant
Quentin Jamal Parks was charged with unlawfully carrying a weapon.  After the
trial court denied Parks’s motion to suppress, he entered a no contest plea and
was sentenced to one year in jail, suspended for one year, and fined $300.00.  Parks
appeals the judgment, arguing the trial court erred in denying the motion to
suppress because the investigative detention that lead to the discovery of the
weapon was not supported by reasonable suspicion.  We agree, reverse the
judgment, and remand the case to the trial court for further proceedings.

Background

During the hearing on the
motion to suppress, San Antonio Police Officer Reed Hensley testified that he
and his partner were on patrol in a marked police vehicle on November 23,
2007.  At approximately 9:30 p.m., Officer Hensley saw Parks and three other
individuals walking behind some stores in a strip mall.  He testified the men
were near the back doors of the building, but they did not approach any of the
doors or try to open any of them.  Officer Hensley used his car’s spot light to
illuminate the four men and he noticed they had blue rags hanging from their
pockets.  Officer Hensley testified that from his nine years of experience on
the police force, he knows gang members will “fly their colors,” and he
associates blue rags with gang members. None of the group altered their walking
direction or style in response to the approaching officers.  According to
Officer Hensley:

We drove over to
where the individuals were and we got out of the car and asked them to place
their hands on the car because they’re in a dark area, we don’t know them.  I suspect
they’re gang members.  Gang members are known to carry weapons to protect themselves
from other gangs and to protect narcotics.

 

When asked what specific words he
used, Officer Hensley testified he said: 

 

How are you doing
this evening?  . . . What are you doing back here? . . . Would you mind coming
over to the car where the light is so we can see you?

 

On cross-examination, Officer Hensley confirmed he
told the men to put their hands on his car, but stated it was not the first
thing he said to them.  The officer testified he used an authoritative tone
with the men, and that he would have stopped them if they had not responded to
his statements.  Officer Hensley testified that most of the group responded
appropriately, but: 

the defendant took
one or two steps backward and started looking around.  I thought he was going
to run, so I repeated my request and he walked over and put his hands on the
hood [of the patrol car].

 

The officer decided to frisk Parks “because the
way he acted I thought he might have something illegal on him:”

I
frisked the defendant because when he took two steps back and started looking
for somewhere to run the — the blue rags hanging from his pocket, I thought
that he might have a weapon or drugs on him which would give him cause to run. 
It’s my experience that, you know, when individuals look to get away, they have
something they’re not supposed to have, and in this case, it happened to be a
gun.

 

During the pat-down, Officer Hensley found a gun
in Parks’s pocket, and he arrested Parks for unlawfully carrying a weapon. 

Officer Hensley testified
he could not recall anyone in the group making furtive gestures, and none of
them made any threats.  None of the group was smoking or passing anything, and
the officer did not observe any of the men engage in any criminal activity.  He
had no prior knowledge about any person in the group.  Officer Hensley
explained that he “wanted to find out who they were and what they were doing
behind a business.”  He testified he had no specific information any of the
group was armed or was a member of a gang, other than the presence of the blue
rags.  The officer testified that all the men were similarly dressed, and
described Parks’s clothing as a “black hoodie, a sweatshirt, a black shirt,
blue jeans, [and] black shoes.”  There was no testimony that the clothing was
emblematic of any gang membership.

One of the men from the
group, Jonathan Wright, testified that he, Parks, and Parks’s brother Randall
worked at a Jim’s restaurant that day.  They were still dressed in their
uniforms and were accompanied by Denzel Coleman when stopped by the police. 
The group was taking a shortcut from a nearby convenience store to his
apartment.  Several of the group had sweat rags that they used bussing the
tables at Jim’s.  He testified that his rag would not have been visible to the
police, but he was not sure whether any other member of the group had a rag
visible.  Wright testified that the police car approached them at a fast speed
and the police immediately told them to put their hands on the car.  Wright did
not feel free to leave.

After a hearing on
Parks’s motion to suppress, the trial court denied the motion and made oral
findings and conclusions.  The court’s findings of fact included: 

$        
There were lights illuminating the scene that night but it was
still dark.

$        
The group was stopped in the parking lot rather than next to the
building.

$        
Officer Hensley was a credible witness.

$        
The officer saw blue rags on at least some of the men.

$        
It is “extremely unusual” to have a blue rag to wipe your face.[1]

$        
It is “highly unusual” to have multiple people with blue rags
hanging down.[2]

$        
The clothing and the rags worn by the group “met” gang
identifiers or markers.[3]

$        
Parks “kind of stepped back and looked as if he was seeing that
maybe he was going to run or whatever.”

$        
When the officer discovered the weapon during the frisk, it was
readily apparent to the officer that the object was a handgun. 

 

In addition, the trial judge stated he was “not
saying that [Jonathan Wright] is not credible.”  The trial court concluded:

$        
The officers had a right to approach the group to investigate.

$        
The officers found the men in a suspicious place under
circumstances which reasonably showed the men could be about to commit some
offense. 

$        
Parks’s actions (looking around as if he was going to run)
justified the pat-down search for weapons because “they appeared to meet the
description of potential gang members who are known to carry weapons.”

 

Standard of Review

 

We review the trial
court’s ruling on a motion to suppress under an abuse of discretion standard.  State
v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).  We view the record
in the light most favorable to the trial court’s ruling and will reverse only
if the ruling is outside the zone of reasonable disagreement.  Id.  We
give almost total deference to the trial court’s determination of historical
facts, especially those based on an evaluation of the witnesses’ credibility
and demeanor.  Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App.
1997).  We review de novo the trial court’s application of the law of search
and seizure to the facts.  Wiede v. State, 214 S.W.3d 17, 25 (Tex. Crim.
App. 2007).  We will sustain the trial court’s ruling “if it is reasonably
supported by the record and is correct on any theory of law applicable to the
case.”  Dixon, 206 S.W.3d at 590.

Applicable Law & Discussion

 

Parks argues the trial
court should have granted his motion to suppress because the officers did not
have reasonable suspicion to detain or to search him.  To decide these issues,
we must first determine whether the officers’ initial interaction with the men
was a consensual encounter or an investigative detention. 

                                        Encounter
or Investigative Detention?

 

“An encounter takes place
when an officer approaches a citizen in a public place to ask questions, and
the citizen is willing to listen and voluntarily answers.”  Crain v. State,
315 S.W.3d 43, 49 (Tex. Crim. App. 2010).  Police do not need any articulable
cause to initiate an encounter because an encounter does not implicate the
Fourth Amendment.  Id.  “On the other hand, an investigative detention
occurs when a person yields to the police officer’s show of authority under a
reasonable belief that he is not free to leave.”  Id.  An officer must
possess reasonable suspicion to initiate an investigative stop.  Davis v.
State, 947 S.W.2d 240, 244-45 (Tex. Crim. App. 1997).  In
determining whether an interaction was an encounter or a detention, the court:

focuses on whether
the officer conveyed a message that compliance with the officer’s request was
required.  The question is whether a reasonable person in the citizen’s
position would have felt free to decline the officer’s requests or otherwise
terminate the encounter.

 

Crain, 315 S.W.3d at 49.  The Court of
Criminal Appeals has identified several factors to consider in determining
whether an investigative detention has occurred: the threatening presence of
several officers; display of a weapon by an officer; some physical touching by
police; and the use of language or tone of voice indicating compliance
with the officer’s request might be compelled.  Id. at 49-50 (emphasis
in the original) (citing U.S. v. Mendenhall, 446 U.S. 544, 554 (1980)). 

The issue in Crain
was whether an officer’s encounter with the defendant was a consensual
encounter or an investigative detention.  The officer testified he was in his
patrol car, responding to a call for service at about 12:30 a.m., when he first
observed the defendant walking in a residential neighborhood.  As he
drove by, the officer saw the defendant “grab” at his waist.  Id. at
46.  The officer proceeded to his call and returned approximately ten minutes
later to look for the defendant.  Id.  When the officer found the
defendant walking across a yard, he called out to the defendant and “asked him
to come over and talk.”  Id.  The officer also shined the patrol car’s
spotlight on the defendant.  Id.  The defendant took a few more steps
and then stopped.  Id.  The officer acknowledged the request could have
sounded as if it were an order.  Id.  The officer also testified that he
would not have pursued the defendant if there had not been compliance with his
request because the officer had not observed any criminal activity.  Id. at
46-47.  The officer exited his vehicle, and as he approached the
defendant, the officer smelled what he believed to be the odor of marijuana
coming from the defendant’s clothes and breath.  Id.  When the defendant
began to show signs of nervousness, the officer suspected the defendant was in
possession of marijuana.  Id. at 47.  The officer walked the
defendant towards the patrol car while holding the defendant’s hands behind the
defendant’s back.  Id.  Another officer arrived to assist, they frisked
the defendant, and found a gun.  Id.  The defendant’s motion to suppress
the evidence was denied and he was convicted of a weapons charge.  Id.

The Texas Court of
Criminal Appeals held the initial encounter between the defendant and the
officer in Crain was an investigatory detention:

We
. . . conclude that [the officer’s] act of shining his patrol car’s overhead
lights in appellant’s direction, coupled with his
request-that-sounded-like-an-order, to “come over here and talk to me,” caused
the appellant to yield to [the officer’s] show of authority C a reasonable person in the
appellant’s shoes would not have felt free to leave or decline the officer’s
requests.  We thus hold that a detention occurred during the initial
interaction between the appellant and [the officer].  Therefore, in order for
that initial interaction to have been legal, [the officer] needed to have
reasonable suspicion that the appellant was engaged in criminal activity at the
time of his approach.

 

Id. at 53 (footnote
omitted).

 

Applying the court’s
reasoning in Crain to the facts of our case, we hold the initial
encounter between Parks and Officer Hensley was a detention.  Officer Hensley
initially used his spotlight to illuminate Parks.  Although the court in Crain
iterated its earlier holding in State v. Garcia-Cantu, 253 S.W.3d 236
(Tex. Crim. App. 2008), that the use of a spotlight does not always turn a
consensual encounter into a detention, the court noted that it may be
considered a factor in determining whether a person yielded to a show of
authority.  Crain, 315 S.W.3d at 51; see also Garcia-Cantu, 253
S.W.3d at 245 n. 43 (discussing numerous cases addressing use of police
emergency and spotlights as possible show of authority).  The men stopped when
Officer Hensley drove to their location and issued his request/command that
they walk over to the patrol car and place their hands on the car.  Officer
Hensley admittedly spoke the words in an authoritative tone.  And although the
subjective intent of the officer does not control the resolution of the issue,
Officer Hensley testified that Parks was not free to disregard the request,
suggesting the request/command was delivered in an authoritative manner.  Finally,
there were two officers present during the encounter, both dressed in full
uniform and armed.  Although Parks did not immediately place his hands on the
patrol car as instructed, he “yielded” to Officer Hensley’s request/command by
stopping his path of travel.  Viewing the totality of the circumstances, a
reasonable person would not have felt free to leave or to decline the officer’s
request.  We therefore hold the initial interaction between the officers and
Parks was a detention, not a consensual encounter.

Reasonable
Suspicion?

 

“Reasonable
suspicion exists if the officer has specific, articulable facts that, when
combined with rational inferences from those facts, would lead him to
reasonably conclude that a particular person actually is, has been, or soon
will be engaged in criminal activity.”  Ford v. State, 158 S.W.3d 488,
492 (Tex. Crim. App. 2005).  “Under this standard, the articulable facts on
which the officer relied need only support a reasonable belief that activity
out of the ordinary is occurring or has occurred, that the detainee is
connected to the unusual activity, and that the unusual activity is related to
crime.”  State v. Garcia, 25 S.W.3d 908, 912 (Tex. App.—Houston [14th
Dist.] 2000, no pet.).

Officer Hensley did not
testify there was any unusual activity relating to crime other than the
presence of the blue rags.  Although he testified the men were walking near the
back doors of the businesses, Officer Hensley stated the group appeared to be
walking past the location, no one appeared to be checking the doors to the
businesses or the dumpsters, none of the group appeared to react to his
presence by changing his manner of walk, no furtive gestures or gang hand
signals were noted, nothing passed among the men, and the officer had no
information that any of the group had a criminal record or was a gang member. 
The only factual circumstance the State appears to rely on to show reasonable
suspicion is the presence of the blue rags.  According to Officer Hensley, gang
members often “fly their colors,” a blue rag signifies gang membership, and
gang members often carry weapons to protect themselves or drugs.  The State
argues Officer Hensley could conduct a frisk either because he had reasonable
suspicion Parks was engaged in criminal activity — presumably unlawfully
carrying a weapon or possessing drugs — or to ensure officer safety during the
investigative detention.  Under either theory, reasonable suspicion must exist.

Viewing the totality of
the circumstances, we conclude there was no reasonable suspicion.  Unlike the
well-known circumstances in Terry v. Ohio,[4]
 Officer Hensley testified the men did not devote their attention to the doors
of the closed stores.  The officer did not articulate any reason, based either
on their location or their actions, to suspect the men were about to engage in
criminal activity.  The only evidence relating to suspicions of criminal
activity was the officer’s testimony that he suspected the men were gang
members, and his experience taught him that gang members usually carry weapons
or drugs.  But that testimony does not rise above mere surmise or hunch.  While
the State correctly argues that gang membership may be a factor to be
considered in determining if reasonable suspicion exists,[5]
it has not cited any authority holding that gang membership alone provides
reasonable suspicion for an investigative detention or a Terry frisk. 
Reviewing cases from other jurisdictions, it appears gang membership may be a
factor in determining reasonable suspicion, but gang membership, alone, does
not provide reasonable suspicion.

In State v. Jones,
835 P.2d 863 (N.M. Ct. App. 1992, cert. denied), the New Mexico court of
appeals held that inferences from “gang membership and presence in a gang
activity area” are not sufficient by themselves to support reasonable
suspicion.  835 P.2d at 867.  In Jones, the police saw three individuals
walking down the street in an area of high gang activity.  Id. at 865.
One of the men was known to the police as an avowed gang member and narcotics
distributor. Id.  Because the police frisked this person every time they
encountered him, the man assumed a “frisk” position without being asked.  Id. 
The defendant was not known to be a gang member, but he was wearing clothes and
a particular brand of athletic shoe associated with a particular gang.  Id. 
Because of his manner of dress, the area of town, and his being in the company
of a known gang member, the police asked the defendant to assume the same
stance, frisked him, and found a weapon.  Id.  Rejecting the State’s
argument that the frisk was permitted under Terry, the court held the
trial court erred in denying the motion to suppress:

However, in Terry,
the officer who stopped the defendant suspected that he and his cohorts were
inspecting a retail establishment for the opportunity to rob it.  The officer
suspected the defendant individually of being in the process of committing the
particular crime of robbery.  The officers in this case undoubtedly suspected
defendant of being a gang member.  Yet, they had only generalized suspicions
that a gang member, not specifically defendant, had committed a litany of
crimes.  Their experience told them that a gang member, at any given time, is
possibly engaged in a narcotics or weapons violation, or both.  Yet, they had
nothing connecting this individual defendant to a particular crime or crimes,
except the likelihood that he was a gang member.

 

Id. at 867.

The Oregon Supreme Court
has also addressed the issue of whether gang membership provides reasonable
suspicion that a person poses a risk to an officer’s safety and thus permits a
frisk for weapons under the Oregon constitution.[6] 
In State v. Miglavs, 90 P.3d 607 (Or. 2004), a police officer stopped
three individuals she suspected of violating a curfew.  Because the officer was
alone and the stop occurred in a dark parking lot, she requested assistance.  90
P.3d at 608.  Two backup officers arrived and the police determined two of the
individuals were free to go.  However, they remained while the officer
continued to investigate the third person for a possible curfew violation.  Id.
at 609.  The officer became concerned for her personal safety because the
individuals were wearing distinctive clothing that identified them as members
of a specific urban gang, and members of that gang were known to carry weapons.
 Id.  The Oregon court concluded the police had reasonable suspicion to
frisk for weapons.  Id. at 611-13.  In reaching its conclusion, the
court stated that neither a person’s appearance alone nor “clothing that
announces a gang affiliation” provides the individualized suspicion required to
conduct a frisk for weapons.  Id. at 613.  The court emphasized that it
was the officer’s training and experience with the particular gang to which the
defendant belonged and her knowledge of the weapon-carrying propensities of
that gang, together with the circumstances of the detention, that provided the
particularized suspicion sufficient to support the frisk.
 Id. at 613-14.

In United States v.
Amoroso, 257 F.Supp.2d 310 (D. Me. 2003), the court held police did not
have reasonable suspicion to perform an investigatory stop.  The police were
investigating a large gang fight.  Id. at 312.  About forty-five minutes
after the fight, a police officer saw Amoroso walking down the street wearing
his gang jacket.  Id. at 312-13.  The officer had prior dealings with
Amoroso and knew he was a gang member.  Id. at 313.  The officer
testified that tensions between rival gangs had been growing.  Id. at
312.  The earlier fight had involved several members of the rival gang, and
police suspected, but had not confirmed, that members of Amoroso’s gang had
been involved.  Id.  Police had recovered weapons from some gang members
involved in the fight.  Id.  The officer also testified that in the
months preceding the fight, when police stopped gang members, they were always
carrying a weapon.  Id.  The officer could only recall one instance when
a gang member had not been armed.  Id.

The officer parked his
vehicle in front of Amoroso, and Amoroso approached the passenger side of the
police car.  Id. at 313.  The officer testified this action made him
nervous because it put him in a defensive posture.  The officer exited his
vehicle, which prompted Amoroso to raise his hands.  Id.  The officer
ordered Amoroso to come around the car.  Id.  When Amoroso did not
comply, the officer repeated his command, and Amoroso complied.  Id. 
The officer asked Amoroso if he was armed, and he admitted he had a gun.  Id. 
The district court granted Amoroso’s motion to suppress, reasoning there was no
reasonable suspicion Amoroso was involved in any criminal activity.  Id.
at 316.  His gang membership, the fact gang members in that area were always
armed, that a gang fight had just occurred in the vicinity, and Amoroso’s
failure to initially comply with the officer’s command did not rise to the
level of reasonable suspicion.  Id. at 314-15. 

We agree with the
reasoning of the foregoing cases and hold Officer Hensley lacked individualized
suspicion linking Parks to any criminal activity.  The officer’s testimony does
not provide articulable facts linking Parks to any criminal activity or a
weapon.  Officer Hensley did not testify that any particular gang identified itself
with similar blue rags, that such a gang was active in the area, or how he
acquired his knowledge about the weapon-carrying propensities of that
particular gang.  Although the officer testified that he has come into
“contact” with “gang members” at least once a day for the nine years he has
worked as a police officer, he was never questioned about the basis for his
testimony that he associated blue rags with gangs or how he acquired knowledge
that “gang members” carry weapons.




 

Conclusion

 

           The trial court erred in denying the
motion to suppress.  The judgment is reversed and the case is remanded to the
trial court for further proceedings consistent with this opinion.

 

 

Steven C. Hilbig, Justice

 

Publish

 

 

 

 

 

 

 









[1]
There was no testimony on this point.





[2]
There was no testimony on this point.





[3]
There was no testimony that the clothing
was identified with any gang.

 





[4]
392 U.S. 1 (1968).





[5]
See, e.g. Molina v. State, 754 S.W.2d 468, 473-74 Tex. App.—San Antonio
1988, no pet.) (officer could take gang membership into consideration when
stopping group of men loitering near bus stop in tourist area that experienced
a high incidence of crime related to tourism where group had several
opportunities to board buses but failed to do so).





[6]Although the court appeared to limit its analysis to
its state constitution, the scope of a lawful investigative detention and
protective frisk under the Oregon constitution appears to be the same as a Terry
detention and frisk.